1          IN THE UNITED STATES DISTRICT COURT
         FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2

3    UNITED STATES OF AMERICA,

4       vs.
                                 Criminal No. 19-1380
5    MUSTAFA MOUSAB ALOWEMER,
              Defendant.
6

7          Transcript of Preliminary Examination Proceedings on
Friday, June 21, 2019, United States District Court,
8   Pittsburgh, Pennsylvania, before Cynthia Reed Eddy, Chief
District Magistrate Judge.
9
APPEARANCES:
10
     For the Government:          Soo C. Song, Esq.
11                                Assistant U.S. Attorney
                                  400 U.S. Courthouse
12                                700 Grant Street
                                  Pittsburgh, PA 15219
13

14   For the Defendant:          Michael J. Novara, Esq.
                                 Andrew Z. Lipson, Esq.
15                               Sam Sayer, Esq.
                                 Federal Public Defender's
16                               Office
                                 1001 Liberty Avenue
17                               1500 Liberty Center
                                 Pittsburgh, PA  15222
18

19

20
Court Reporter:                  Juliann A. Kienzle, RMR, CRR
21                               5300 U.S. Courthouse
                                 700 Grant Street
22                               Pittsburgh, PA 15219
                                 (412) 261-6122
23

24          Proceedings recorded by mechanical stenography;
transcript produced by computer-aided transcription.
25

1  (Proceedings held in open court; Friday, June 21, 2019.)

2           THE COURT:  Good morning.

3              This is the time scheduled for the initial appearance

4  in the matter of the United States of America versus

5  Mustafa Alowemer, Criminal No. 19-1380.  That's a magistrate

6  number.

7              Will counsel for the government please enter her

8  appearance.

9           MS. SONG:  Good morning, Your Honor.  Soo Song for the

10 United States.

11          THE COURT:  Would counsel for the defendant please

12 enter his appearance.

13          MR. NOVARA:  Michael Novara and Sam Saylor for the

14 defendant.

15          THE COURT:  We have an interpreter here today.

16 Mr. Alaa Aqra, who is a federal contractor.

17             I'm going to ask my courtroom deputy to swear him at

18 this time.

19       (Administration of the oath of interpreter.)

20          THE COURT:  Mr. Alowemer, the purpose of this

21 proceeding is to advise you of the nature of the charges

22 against you.

23          Ms. Song, would you please advise the defendant of the

24 charges as well as the maximum penalties.

25          MS. SONG:  Yes, Your Honor.

1          Mr. Alowemer, you are charged in the Western District

2   of Pennsylvania in a criminal complaint with one count of

3   violating Title 18, United States Code, Section 2339-B(a)(1).

4          That crime is attempting to provide material support

5   and resources, in this case, services and personnel to a

6   designated foreign terrorist organization being ISIS.

7          You're also charged with two counts of violating Title

8   18, United States Code, Section 842(p)(2)(B).

9          That makes it a crime to distribute information

10  relating to explosives, destructive devices, or weapons of mass

11  destruction knowing that that person intended to use the

12  information in furtherance of a federal crime of violence.

13          Each of the three counts with which you are charged

14  carries a maximum punishment of 20 years imprisonment.

15          THE COURT:  Mr. Alowemer, today is not the day you'll

16  be called upon to answer for these charges.  However, you have

17  certain rights in relation to these charges I wish to explain

18  to you.

19          You have the right to remain silent.  Any statements

20  that you make to investigating agents or the prosecuting

21  attorney may be used against you.

22          You have the right to consult with counsel before

23  answering these charges.

24          I have before me your financial affidavit which

25  indicates to me you're requesting the appointment of counsel.

1           Is that correct?

2           THE DEFENDANT:  Yes.

3           THE COURT:  Please raise your right hand, sir.

4       (Administration of the oath.)

5           THE COURT:  I have reviewed your financial affidavit

6 and I am appointing counsel for you.

7           Since you were charged by criminal complaint, you're

8 entitled to a preliminary hearing on this matter.

9           Is the government ready to proceed?

10           MS. SONG:  We are, Your Honor.

11           THE COURT:  You may do so.

12           MS. SONG:  At this time, the United States calls

13 Special Agent Gary Morgan to the witness stand.

14           THE COURT:  Please come forward and be sworn.

15       SPECIAL AGENT GARY MORGAN, a witness having been duly

16 sworn, testified as follows:

17                       DIRECT EXAMINATION

18 BY MS. SONG:

19 Q.  Sir, please tell the Court your name again.

20 A.  My name is Gary Morgan.

21 Q.  How are you employed?

22 A.  I'm a special agent with the FBI assigned to the

23 Pittsburgh Division Joint Terrorism Task Force.

24 Q.  How long have you been a special agent?

25 A.  Nearly 16 years.

1  Q.  Prior to becoming a special agent, did you have any other

2  law enforcement type experience or intelligence experience?

3  A.  Yes, ma'am.  I was an intelligence analyst for the Drug

4  Enforcement Administration for six years.

5  Q.  You mentioned that you're currently assigned to the Joint

6  Terrorism Task Force?

7  A.  Yes, ma'am.

8  Q.  Would you please explain whether those types of crimes

9  have been crimes that you have investigated for a significant

10 amount of time as an FBI agent?

11 A.  Yes.  I have extensive experience and training conducting

12 international terrorism investigations.

13 Q.  Special Agent Morgan, are you aware of the charges in the

14 criminal complaint?

15 A.  I am.

16 Q.  Have you affirmed the facts in the criminal complaint?

17 A.  I have.

18 Q.  Would you describe generally what are the criminal

19 violations that the FBI investigated?

20 A.  Yes, Mr. Alowemer is charged with attempting to provide

21 material support to a designated Foreign Terrorist

22 Organization, specifically, in this instance, the Islamic

23 State.

24         Additionally, Mr. Alowemer is charged with two counts

25 of distributing information pertaining to the creation of

1  weapons of mass destruction.  Specifically, Mr. Alowemer

2  provided two documents to an individual who he thought was a

3  like-minded ISIS operative, those documents being the

4  Beginner's Course For the Young Mujahedeen and Manufacturing

5  the Easiest Explosive Devices.

6  Q.  You said Manufacturing the Easiest Explosive Devices?

7  A.  Yes.

8  Q.  This investigation was directed and overseen by the Joint

9  Terrorism Task Force?

10  A.  Yes, ma'am.

11  Q.  In essence, Special Agent Morgan, what was the violent

12  plot that the FBI was able to detect and interrupt?

13  A.  Mr. Alowemer engaged in a plot to place an explosive

14  device next to a church, which was ultimately identified as the

15  Legacy International Worship Center located at 2131 Wilson

16  Avenue on the North Side of Pittsburgh.

17  Q.  Special Agent Morgan, what is a foreign terrorist

18  organization?

19  A.  A foreign terrorist organization is a group that is

20  designated by the Office of Foreign Assets Control under the

21  Department of Treasury.  Those organizations are designated as

22  engaging in terrorist activities and individuals prohibited

23  from providing support or assistance to those entities.

24  Q.  So it's a formal designation?

25  A.  Yes, ma'am.

1  Q.  Is ISIS a foreign terrorist organization?

2  A.  Yes, ISIS was designated as a foreign terrorist

3  organization under its various names that it has used since its

4  inception to the present date.

5  Q.  Through your experience as an FBI agent on the Joint

6  Terrorism Task Force and investigating these crimes, are you

7  familiar with some of the tactics employed by ISIS in their

8  terrorist activities?

9  A.  Yes, ma'am.  The Islamic State seeks to establish a

10 caliphate in the Middle East or an Islamic State for all

11 Muslims to return to.  The Islamic State is run by an

12 individual by the name of Abu Bakr al-Baghdadi.  He's the

13 self-professed caliph of the Islamic State.  The Islamic State

14 engages in a number of violent acts to include murder, rape,

15 slavery.  They utilize technology to include the Internet,

16 encrypted communications --

17 Q.  Let me stop you for a moment.

18         You said they utilize the Internet, encrypted

19 communications; what are they utilizing the Internet to do?

20 A.  They utilize the Internet to recruit individuals and

21 disseminate the propaganda recruitment material.

22 Q.  Does ISIS have a recognizable flag or insignia?

23 A.  Yes.  ISIS has -- they have adopted what is referred to as

24 the Black Standard.  It's a black flag with white text overlaid

25 on the black flag.  The text is Arabic.  It's essentially the

1  Shahadah, which is the Muslim profession of faith, which is

2  essentially translated as there is no God but Allah and

3  Mohammed is his messenger.

4  Q.  That phrasing configured in the way that you've described

5  has become associated with ISIS?

6  A.  Yes.  A number of terrorist organizations have co-opted it

7  and utilized it in the dissemination of propaganda recruitment

8  materials.

9  Q.  Special Agent Morgan, I'm going to ask you some questions

10 about the defendant.

11         How did Mr. Alowemer come to be in the United States?

12 A.  Mr. Alowemer was born in Syria.  He and his family made

13 their way to Jordan.  In 2016, they departed Jordan and entered

14 the United States in New York as refugees.

15 Q.  He's been residing in the Pittsburgh area since 2016?

16 A.  Yes, ma'am.

17 Q.  Special Agent Morgan, why did this defendant become a

18 concern to the FBI?

19 A.  Through an investigation, a computer was identified with

20 an IP address that was determined to resolve to Mr. Alowemer's

21 mother.  That computer was utilized on two occasions at two

22 different locations to access a Dark Web site that is used by

23 the Islamic State to disseminate extremist propaganda

24 recruitment materials.

25 Q.  Was there additional online activity that the FBI became

1  aware of that prompted this investigation?

2   A.  Yes.  A Facebook page was located identifiable to

3  Mr. Alowemer.  The vanity name was Mustafa Alowemer.  There was

4  a profile photo that is identical to Mr. Alowemer.  The

5  introduction of that page included an Arabic, the translation

6  of which indicated that Mr. Alowemer desired to die in a manner

7  which would prevent the traditional Muslim customs of burial,

8  suggesting -- the FBI interpreter who reviewed that information

9  assessed that to be a reference to Mr. Alowemer wanting to die

10  in an explosion.

11   Q.  In an explosion?

12   A.  Yes.

13   Q.  Were there other social media or other accounts that the

14  FBI began to monitor associated with this defendant?

15   A.  Yes.  Mr. Alowemer utilized a number of social media

16  accounts to include Instagram, YouTube, SoundCloud.  Utilizing

17  those facilities, Mr. Alowemer was in contact with a number of

18  individuals, some of whom were subject to FBI investigations as

19  well.  Many of the individuals that Mr. Alowemer was in contact

20  with via those social platforms had vanity names or

21  incorporated some variation of ISIS or Islamic State or

22  Bin Laden, for instance.

23   Q.  Did you say vanity names?

24   A.  Vanity names, yes.

25   Q.  What they were referring to online, their handles?

1  A.  Yes, their handles, yes.

2        Additionally, some of the avatars or profile photos

3  associated with those accounts included images that were

4  indicative of violence in the battlefield, martyrdom, weapons,

5  firearms, images of that nature.

6  Q.  You said the FBI was aware that the defendant was

7  communicating with other individuals who were under

8  investigation.

9        Did the FBI become aware of him communicating with

10  other individuals who had sworn allegiance to ISIS and/or been

11  convicted in federal court?

12  A.  Yes, ma'am.  Mr. Alowemer was in Facebook contact

13  primarily through commenting on various posts with another

14  individual in Milwaukee who ultimately pled guilty to providing

15  material support to the Islamic State.  She was utilizing

16  Facebook to hack other social media accounts and she was using

17  those --

18        MR. SAYLOR:  Objection, Your Honor.  I object to

19  personal knowledge at this point.  That was referring to a

20  second investigation that I'm unclear --

21        THE COURT:  Your objection is overruled.  In a

22  probable cause hearing it may be based in part or on hearsay,

23  so I'm overruling your objection.

24        Would you restate the question, please, Ms. Song.

25        MS. SONG:  Yes.

1 BY MS. SONG:

2 Q.  Special Agent Morgan, I think you were talking about

3 another individual who had pled guilty to disseminating

4 material with whom the defendant was communicating?

5 A.  Yes, ma'am.  That individual also prepared, she swore her

6 allegiance to the Islamic State.  She was utilizing Facebook to

7 locate and identify other social media accounts.  She would

8 then hack those accounts and use those accounts to disseminate

9 ISIS propaganda recruiting materials.

10 Q.  Approximately, when was the communication going on between

11 Mr. Alowemer and this individual who has pled guilty?

12 A.  2017.

13 Q.  Do you happen to know if that continued through 2018?

14 A.  It did, yes, it continued to the time of her arrest.

15 Q.  Special Agent Morgan, given the defendant's online

16 profile, did FBI make a decision to attempt to introduce an

17 online covert employee of the FBI?

18 A.  Yes, ma'am.  It was determined that an online covert

19 employee or an OCE would be introduced to Mr. Alowemer in March

20 of this year.

21 Q.  Again, why did the FBI make that decision?

22 A.  To assess what threat, if any, Mr. Alowemer posed to the

23 safety of the public and the national security of the United

24 States.

25 Q.  How did the defendant respond to that contact?

1  A.  He responded immediately, frequently, and with great

2  enthusiasm.

3  Q.  When we talk about this online covert employee, or OCE,

4  what did Mr. Alowemer understand this person to be or where he

5  was or what he was doing?

6        MR. SAYLOR:  Objection, that's attributing, that's

7  making an assumption about what my client understood.  I don't

8  think Mr. Morgan is in a position to do that.

9        MS. SONG:  Your Honor, there will be

10 cross-examination.  If the agent cannot answer the question

11 based on his knowledge, he ought not answer the question.

12       THE COURT:  I'm going to overrule your objection.  It

13 is subject to cross-examination.

14 BY MS. SONG:

15 Q.  Special Agent Morgan, based on the communications, the OCE

16 was whom to Mr. Alowemer?

17 A.  The OCE presented himself as another ISIS, like-minded

18 ISIS brother residing in the United States in a state other

19 than Pennsylvania.

20 Q.  Special Agent Morgan, the online covert employee, do you

21 happen to know if he and the defendant engaged in discussions

22 about nafir?

23 A.  Yes.

24 Q.  What is nafir?

25 A.  Nafir is the desire to travel overseas to engage in jihad.

1 Specifically, in this instance, Mr. Alowemer wanted to travel

2 overseas to fight in support of Islamic State and die as a

3 martyr on the battlefield.

4 Q.  Did the online covert employee and the defendant talk

5 about other grievances related to ISIS?

6 A.  Yes.  Specifically, at various points, Mr. Alowemer

7 suggested the identification of local Pittsburgh-based Kurdish

8 Yazidis that could be presented as targets for the brothers.

9 Q.  You said local Kurdish Yazidis?

10 A.  Yes, ma'am.

11 Q.  This was the defendant proposing them as what in

12 conversation?

13 A.  Earlier this year, the Islamic State lost its last

14 remaining bit of territory in Eastern Syria.  There was a city

15 by the name of al-Baghuz.  With the support of the United

16 States, Kurdish Syrians defeated the Islamic State in that area

17 and repelled them.

18 Q.  Special Agent Morgan, did the defendant talk about his

19 time in Jordan in the communications with the online covert

20 employee?

21 A.  Yes, Mr. Alowemer, said he grew up in Jordan to love the

22 martyrdom and the brothers and the jihad, and he said he was

23 arrested on three occasions for his association with the

24 brothers, which was believed to be a reference to these Islamic

25 State brothers.

1  Q.  Special Agent Morgan, in the course of the conversations
2  with the OCE, did the defendant raise the topic of explosives?
3  A.  Yes.
4  Q.  How did that come about or what was the nature of that
5  communication?
6  A.  Mr. Alowemer stated his desire to travel overseas and die
7  as a martyr on the battlefield.
8  Q.  Did the conversations between the OCE and the defendant
9  talk about conducting acts of violence in the United States?
10  A.  Yes.
11  Q.  Did those acts of violence refer to explosives or other
12  weapons?
13  A.  Specifically, Mr. Alowemer requested a weapon with a
14  silencer and Mr. Alowemer stated in communications with the OCE
15  that he wanted to utilize that weapon to hunt the enemies of
16  Allah in the forest.
17  Q.  So in conversation with the OCE, the defendant was seeking
18  or asking to be supplied with a weapon with a silencer?
19  A.  Yes, ma'am.
20  Q.  Special Agent Morgan, what is bayáa or abayáa?
21  A.  Bayáa is a swearing of allegiance to the Islamic State or
22  any sort of extremist organization.
23  Q.  Why would a person do that?
24  A.  To demonstrate their commitment to the Islamic State.
25  Q.  Did there come a time in the investigation of this

1 defendant that he recorded a bayáa video?

2 A.  Yes, ma'am.

3 Q.  Approximately when was that?

4 A.  I believe it was in April of this year.

5 Q.  This recorded video, did the defendant distribute it to

6 the OCE?

7 A.  He did.

8 Q.  After the defendant sent this video of himself pledging

9 allegiance to whom precisely, if you recall?

10 A.  Specifically, Mr. Alowemer in his bay'aa video was

11 pledging allegiance to al-Baghdadi, the aforementioned caliph

12 of the Islamic State.

13 Q.  It was very express to ISIS?

14 A.  Yes, ma'am.

15 Q.  After the defendant sent this expression of loyalty and

16 allegiance to Baghdadi, what action did the OCE take?

17 A.  The OCE then provided Mr. Alowemer the means with

18 contacting who Mr. Alowemer believed was a like-minded ISIS

19 brother, also located somewhere in the United States, a state

20 other than Pennsylvania, but, in fact, was a UCE or undercover

21 employee.

22 Q.  Was this in relation to the express desire by this

23 defendant to commit acts in the United States?

24 A.  Yes, ma'am.  Mr. Alowemer repeatedly stated his desire to

25 meet brothers, like-minded brothers in the United States who

1  wanted to engage in similar activities.

2  Q.  So, the OCE has now provided contact information to the

3  defendant for a live person in the United States; is that

4  correct?

5  A.  Yes, ma'am, yes.

6  Q.  How quickly did that contact occur between the defendant

7  and this other FBI employee?

8  A.  Within days.

9  Q.  Within days.  So they began to communicate online?

10  A.  Yes, ma'am.

11  Q.  What were some of the topics that they talked about

12  online?

13  A.  Mr. Alowemer expressed a desire to -- he, again, mentions

14  Yazidis as possible targets for attack, exact revenge.  He

15  requested a secure means of communication, a cellphone to avoid

16  electronic surveillance.

17  Q.  When he was talking about Yazidis that he was proposing as

18  targets, was it just as a group generally or was he actually

19  identifying some individual people?

20  A.  He provided a photo to include three individuals believed

21  to be located in the Pittsburgh area.

22  Q.  He thought that they would be a desirable target for ISIS?

23  A.  Yes, ma'am.

24       MR. SAYLOR:  Objection to leading at this point, Your

25  Honor.

1          THE COURT:  I'll sustain.

2          Could you rephrase your question, please, Ms. Song.

3  BY MS. SONG:

4  Q.  Special Agent Morgan, why were the Yazidis proposed as a

5  potential target to the OCE and UCE?

6  A.  Again, to exact revenge for the fall of ISIS' last

7  remaining stronghold in Eastern Syria.

8          MR. SAYLOR:  Objection to speculation.  I'm not sure a

9  foundation has been laid for that.

10  BY MS. SONG:

11  Q.  Special Agent Morgan, is your response based on your

12  review of the materials in relation to this case?

13  A.  Yes, ma'am.

14          THE COURT:  I'll overrule the objection.  It's subject

15  to cross-examination.

16  BY MS. SONG:

17  Q.  Special Agent Morgan, did this online relationship between

18  what we're now calling the UCE; is that correct?

19  A.  Yes, ma'am.

20  Q.  Did the online relationship between the defendant and the

21  UCE progress to an in-person relationship?

22  A.  It did.

23  Q.  How did that happen?

24  A.  There was a meeting that lasted a number of hours between

25  the UCE, Mr. Alowemer, and a CHS.

1  Q.   That occurred in the Pittsburgh area?

2  A.   Yes, ma'am, north of Pittsburgh.

3  Q.   What was discussed in that meeting in person that lasted

4  for several hours?

5  A.   At that meeting, Mr. Alowemer proposed as a target of an

6  IED type attack a Shia mosque in the Pittsburgh area.

7  Mr. Alowemer was provided with a phone, as per his request,

8  again, to engage in secure communication with the UCE and to

9  avoid what he believed would be electronic surveillance.

10  Q.   So he was seeking a phone to communicate with the UCE?

11  A.   Yes, ma'am.

12  Q.   Was there discussion about bombs and explosives to be used

13  in an attack?

14  A.   Yes.  Again, they discussed utilizing an explosive device

15  to be placed next to a mosque which Mr. Alowemer believed was a

16  Shia mosque.

17  Q.   In these meetings in person that lasted for several hours,

18  what did the UCE and the CHS represent themselves to be?

19  A.   Like-minded brothers who wanted to engage in similar

20  activity and could do so.

21  Q.   With or without a direct connection to ISIS?

22  A.   With a direct connection to ISIS.

23  Q.   With a direct connection to ISIS?

24  A.   Yes.

25  Q.   So as a result of the defendant's request for a secure

1 phone, did they give him a phone?

2 A.  They did.

3 Q.  Did he take the phone?

4 A.  He did.

5 Q.  From this meeting in April of this year, did the defendant

6 maintain that phone?

7 A.  Yes.

8 Q.  Following the first meeting that you described, did online

9 communications continue between the UCE and the defendant?

10 A.  On an almost daily basis.

11 Q.  Special Agent Morgan, what is a nasheed?

12 A.  A nasheed is a chant, an acapella chant that is not

13 accompanied by music.  It has been adopted by many terrorist

14 organizations and is used as part of the propaganda.  It's

15 often overplayed in videos of attacks that are carried out by

16 terrorist organizations.

17 Q.  In the course of this investigation, did the defendant

18 write or sing or convey nasheed to the UCE?

19 A.  Yes.  Mr. Alowemer provided the UCE with nasheed which he

20 entitled Longing For Martyrdom.  In that nasheed, he made

21 references to, again, al-Baghdadi, his support for the Islamic

22 State, wishing to die a martyr.  I believe there's a reference

23 to flowing his blood in support of his religion.

24 Q.  Did you say "flowing his blood"?

25 A.  Flowing or spilling his blood in support of his religion.

1 Q.  Did there come a time when there was a second meeting

2 between the UCE and defendant?

3 A.  Yes.

4 Q.  Tell us about that meeting.

5 A.  So, at that meeting, Mr. Alowemer advised the earlier

6 mosque he proposed for an attack location was no longer a

7 suitable target.

8 Q.  Why was it no longer a suitable target?

9 A.  Mr. Alowemer had evidently conducted surveillance of that

10 location.  Mr. Alowemer advised the UCE that the location had I

11 believe he called it a code box, an access panel so it must

12 have had secure access.  There were security cameras as well

13 and it was in close proximity to a police station.

14 Q.  Just to be clear, it was not a suitable location for what,

15 according to the defendant?

16 A.  For the placement of an explosive device to destroy the

17 mosque because he learned that Sunni Muslims frequented that

18 mosque as well as Shiite Muslims.

19 Q.  Can you help us understand why would it be significant to

20 the defendant that Sunni Muslims were at this mosque, not just

21 Shiite Muslims?

22 A.  It stems from sectarian conflict that goes on between an

23 extremist sect of Sunnis and Shiites, and essentially, it stems

24 from the time of the prophet's death, Sunnis decided to follow

25 one individual as the successor to Mohammed, and Shiites

1  followed another individual successor to Mohammed.

2  Q.  Mr. Alowemer falls under which category?

3  A.  Mr. Alowemer is Sunni.

4  Q.  Special Agent Morgan, was there further discussion in the

5  second in-person meeting about bookbags or backpacks?

6  A.  Yes, Mr. Alowemer discussed placing an explosive device in

7  a backpack.

8  Q.  In the discussions about the bomb, did the defendant

9  intend the bomb to go off immediately or would there be some

10  delay?

11  A.  No, Mr. Alowemer intended there to be a delay.  The

12  bomb -- Mr. Alowemer specifically discussed utilization of two

13  vehicles, one vehicle was to be essentially an escape vehicle,

14  the explosive device was to be placed in the second vehicle,

15  which then would have been parked in proximity to the attack

16  location.  The intention was that Mr. Alowemer and the UCE

17  would depart the area and a second vehicle, and Mr. Alowemer

18  discussed as I believe he stated, blocking the license plates

19  or in some way obliterating the license plates and using

20  vehicles with out of state license plates or license plates

21  that were different from the vehicle that was being used by the

22  UCE.

23  Q.  Following the second in-person meeting and further

24  discussion of explosives, did the defendant send propaganda,

25  video materials to the UCE?

A.   Yes.  Mr. Alowemer sent the UCE two documents -- three

documents, two documents that stemmed from the charge of the

WMD charge where the instructions for Young Mujahdeen, which

was a 30-page document that contained a number of guidelines to

include military operations, organizational structures, the

construction of an improvised explosive device, the utilization

of poisons and toxins in the creation of that device.

         The second document that Mr. Alowemer provided to the

UCE was entitled Instructions for Making The Easiest Explosive

Device, or something to that effect.

Q.   Did both of those documents have instructions to make

bombs?

A.   They did, yes.

Q.   Has there been an assessment by FBI of whether one could

have created a viable device based on those instructions?

A.   Yes, ma'am, both documents were reviewed by the FBI

laboratory.  They determined that those instructions could have

been utilized to construct a viable device that would have

resulted in death and injuries to the public.

Q.   Did the defendant ever send videos or demonstrations of

bombs or bombings?

A.   Yes, Mr. Alowemer sent the UCE a video of an individual

directing what appears to be an RPG at a vehicle.  The vehicle

then detonates and destroys a building.

Q.   I need to ask you what RPG is?

1   A.   Rocket propelled grenade.

2   Q.   In the video, a person is shooting at a vehicle and it

3   explodes?

4   A.   Yes, and the vehicle then explodes.

5   Q.   Special Agent Morgan, when the defendant was talking about

6   explosives and bombs with the UCE, did he use the words

7   explosives or bombs, or did they talk in some other way?

8   A.   They utilized code words, specifically, they used terms

9   such as cooking, spices, feeding, meals.

10   Q.   The UCE, his expertise, as represented, again was what?

11   A.   The construction of explosive devices.

12   Q.   Was there ever a discussion, you said they would use the

13   word cooking and spices, and words like that, did they talk

14   about timed cooking or cooking with a timer?

15   A.   Yes.   That was assessed to pertain to the utilization of a

16   timing device to delay the detonation of the explosive device.

17   Q.   Special Agent Morgan, was there a third in-person meeting

18   between the UCE and the defendant?

19   A.   Yes.

20   Q.   That occurred in the Pittsburgh area?

21   A.   It did.

22   Q.   Tell the Court what they discussed at that third meeting.

23   A.   So at the third meeting, Mr. Alowemer identifies a new

24   target, which was ultimately identified as the Legacy

25   International Worship Center, 2131 Wilson Avenue.  Mr. Alowemer

1 apparently selected that individual because at the time, he

2 believed it to be a Nigerian church of polytheist Christians.

3 Q.   You say a Nigerian church of polytheist Christians?

4 A.   Yes.

5 Q.   Why was a Nigerian church of polytheist Christians a

6 desirable target to the defendant?

7 A.   Mr. Alowemer made references to avenging the brothers in

8 Nigeria.

9 Q.   On behalf of whom?

10 A.   The Islamic State and the brothers, that was also a

11 reference to Islamic State brothers.

12 Q.   What else about the plot to bomb this particular church

13 did the defendant present at that third meeting?

14 A.   The utilization of a backpack.  Mr. Alowemer also

15 provided, they were Google printouts of Google satellite maps

16 that were an overlay of the location to include the church.

17 Q.   Did he designate a day of the week that he wanted the

18 bombing to occur?

19 A.   Yes, Mr. Alowemer wanted the bombing to occur on Sunday

20 and the intention there, as stated by Mr. Alowemer, was to

21 cause fear in religious practitioners to prevent them from

22 going to their places of worship on Sunday morning.

23          So, the bomb was to go off in the early hours of

24 Sunday, two, three, four o'clock in the morning.  At that

25 meeting, Mr. Alowemer also presented the UCE and the CHS with

1  rings bearing the Islamic State insignia, the Black Standard,

2  essentially.

3  Q.  He provided those at the meeting?

4  A.  Yes, and they were intended as gifts.

5  Q.  You said he also brought maps to the meeting that he

6  provided to the UCE?

7  A.  Yes, ma'am.

8  Q.  Was there a discussion or production of any of the

9  bomb-making instructions that he had previously sent to the

10 UCE?

11 A.  Yes.

12 Q.  Did they talk about it and/or did he provide him that?

13 A.  Yes.  Mr. Alowemer again provided, it was a page from the

14 instruction manual for Young Mujahdeen, I believe it was a

15 19-point plan that discussed a number of things, operational

16 security, the manner in which he created an explosive device,

17 ways in which to avoid detection.

18 Q.  So there was a very specific target articulated.  Was

19 there discussion about what they would need to make the bombs

20 to blow up the church?

21 A.  Yes.  So a discussion was had regarding the components

22 necessary to construct the IED.  It was determined that the

23 components needed would be 9-volt batteries, nail polish

24 remover containing acetone, which can be utilized as a

25 precursor explosive device, ice packs and nails.  Nails would

1 be shrapnel in the device.

2 Q.  Did the defendant express a willingness to purchase those

3 items?

4 A.  Yes, Mr. Alowemer stated he would purchase those items.

5 Q.  Special Agent Morgan, in the discussion about bombing the

6 church, was there a plan for one device or more than one

7 device, was that discussed?

8 A.  There was a plan for two devices.  One device to be placed

9 at the site of the church and then a second device -- so that

10 device would detonate -- the intention was that the device

11 would detonate ten minutes after he departed the area and then

12 a second device would be placed in that area as well.  That

13 device would be detonated two to three hours later when law

14 enforcement had responded.  Mr. Alowemer stated his intention

15 with the second device was to essentially cause harm to

16 responding law enforcement personnel.  Mr. Alowemer stated that

17 he wanted to make them -- I believe he phrased it as afraid to

18 step.  And Mr. Alowemer also stated that it would shut down the

19 City of Pittsburgh.

20 Q.  Why ten minutes?  Why would the bomb go off ten minutes

21 after the backpack was placed?

22 A.  The intention was that they would depart the area for a

23 mosque that they would attend morning prayers and while

24 departing, they would hear the detonation, explosion of the

25 device to ensure it had, in fact, gone off.

1  Q.  Why was their intention to depart to go to a mosque after

2  placing the bomb?

3  A.  They wanted to be seen at morning prayers to establish an

4  alibi.

5  Q.  Special Agent Morgan, was there then a fourth meeting that

6  occurred in the Pittsburgh area?

7  A.  There was.

8  Q.  This, again, was with the defendant and the undercover?

9  A.  It was with the defendant and UCE again.

10  Q.  There was a detailed target already articulated.  What

11  else about the plan was furthered or finalized in this fourth

12  meeting?

13  A.  SO at that meeting, Mr. Alowemer again presented the UCE

14  with Google maps.  This time the maps had lines indicating the

15  route which they would take.  There were also two circles on

16  the map.  One circle denoted where the UCE in one vehicle would

17  drive Mr. Alowemer to a particular location, as indicated by

18  the circle on the map.  At that location, Mr. Alowemer would

19  exit the vehicle, he would approach the mosque on foot.  He

20  would place the explosive device in close proximity to the

21  mosque -- I'm sorry, the church.  Mr. Alowemer would then

22  return to the vehicle being driven by the UCE.  They would

23  depart the area.

24          The second circle on the map indicates where the CHS

25  was to be parked.  That was in close proximity to a police

station, I believe specifically it was Pittsburgh Zone 1.  The

intention of the CHS being at that location was to observe the

law enforcement response, if any.

Q.  Just to be clear, who was saying that the CHS should be

located across from the police station?

A.  That was Mr. Alowemer.  Mr. Alowemer laid out the plan in

its entirety, the map, the routes, every detail of the plan.

Q.  To his knowledge, were the CHS and the UCE familiar with

Pittsburgh or have they been --

A.  They were not familiar with Pittsburgh.  So in addition to

providing those maps at that meeting, Mr. Alowemer, the CHS and

UCE entered the UCE's vehicle, which was then driven by

Mr. Alowemer.  Mr. Alowemer then drove the vehicle with those

two individuals to the attack location, essentially, conducting

a dry run.  They drove through the neighborhood that was

outlined and indicated on the map provided by Mr. Alowemer.

Q.  Just to be clear, the maps that you're referring to were

appended to the criminal complaint; is that correct?

A.  Yes.

Q.  As Exhibits 1 and 2?

A.  Yes, ma'am.

Q.  The handwriting that appears to be on those maps is the

defendant's handwriting, in conjunction with the routes and

plans?

A.  Yes, ma'am.

1  Q.  Special Agent Morgan, did the defendant discuss

2  attribution for the bombing of the church, who or how a person

3  would claim credit?

4  A.  Mr. Alowemer intended the Islamic State to be able to

5  claim responsibility for that attack.  So to achieve that,

6  Mr. Alowemer suggested one of two things, either leaving a note

7  at the scene of the attack that stated we've arrived, or

8  leaving again the Black Standard, which has been co-opted by a

9  number of organizations to include the Islamic State.

10  Q.  Did he talk about sort of a written statement or a claim,

11  any sort of textual statement to go with the bombing?

12  A.  The note that we've arrived.

13  Q.  We've arrived is the message that he wanted to convey?

14  A.  Yes.

15  Q.  But he didn't personally want to claim responsibility?

16  A.  No, he did not want to claim responsibility.  Mr. Alowemer

17  stated that he wanted to get away.  I think he stated twice,

18  not get caught, not get caught.  He wanted to escape the area.

19  Mr. Alowemer also discussed the manner in which they should

20  communicate with one another following the attack, which

21  essentially was they should not communicate, they should not

22  utilize social media, that they should drop those accounts,

23  that they should have no contact with one another for a period

24  of weeks.

25  Q.  In the course of the fourth in-person meeting where

1   they're talking about bombing the church, was there a

2   discussion about a timer or how they were going to time this

3   device to go off ten minutes after the dropped backpack?

4    A.   Mr. Alowemer arrived at that meeting equipped with the

5   nail polish remover containing acetone, ice packs and

6   batteries.  Mr. Alowemer provided the batteries to the UCE and

7   the UCE placed those batteries inside the timer and

8   demonstrated to Mr. Alowemer that the intention of the

9   batteries was to be utilized in the timer to delay the

10   detonation of the device.

11         Additionally, Mr. Alowemer -- he did not provide nails

12   and he apologized for that and he asked if ball bearings would

13   be an acceptable substitute to be used as shrapnel in the

14   device.

15   Q.  Special Agent Morgan, you described the intended time for

16   the bomb to be in the middle of the night, I think you said two

17   or three in the morning?

18   A.  Yes, ma'am.

19   Q.  There logically wouldn't be people in the church at that

20   time?

21   A.  That's correct.

22   Q.  So what was the contemplation, if anything, about other

23   people being harmed or injured or killed?

24   A.  The UCE conveyed to Mr. Alowemer that the -- Mr. Alowemer

25   stated that he wanted to totally destroy the structure.  The

1  UCE conveyed to Mr. Alowemer that the device of that size to

2  totally destroy the structure would result in death and injury

3  to individuals in the surrounding residential neighborhood, and

4  he raised no objections to that.

5  Q.  "He" being the defendant?

6  A.  Mr. Alowemer raised no objections.

7  Q.  Just to be clear, he didn't articulate the congregants of

8  the church necessarily as his target?

9  A.  That's correct.

10  Q.  Special Agent Morgan, in conjunction with the fourth

11  meeting, were there sort of written instructions that were

12  provided by the defendant?

13  A.  Yes.  Mr. Alowemer provided the UCE with a nine-point,

14  ten-point plan, essentially.

15  Q.  Are those Exhibit 3 and 4 that are appended to the

16  criminal complaint?

17  A.  Yes, ma'am.

18  Q.  There appear to be checkmarks next to the numbers.

19         For the record, Exhibits 3 and 4 are written in

20  Arabic, appear to be; is that correct?

21  A.  Yes, ma'am.

22  Q.  What are the checkmarks, if you know what their

23  significance is?

24  A.  The checkmarks -- as Mr. Alowemer was with the UCE, as

25  Mr. Alowemer went over each step in the plan, Mr. Alowemer made

1 that checkmark on his plan.

2 Q.  The translated version of that document appears in the

3 criminal complaint; is that correct?

4 A.  Yes, ma'am.

5 Q.  Just for the Court, what types of things were specified in

6 that document?

7 A.  Mr. Alowemer stated that the attack should not be carried

8 out during Ramadan, which was this year during the month of

9 May.  Mr. Alowemer was concerned if they carried out their

10 attack during Ramadan, that there would be counterattacks

11 against the mosque and he was concerned that Muslims would be

12 killed or injured.  Again, Mr. Alowemer said the attacks should

13 be conducted on Sunday night.  He said the attack should be

14 carried out by three brothers, the three brothers being

15 Mr. Alowemer, the CHS, the UCE --

16 Q.  To stop you.  The rest of the points in the document, did

17 he make reference to police again and about the need to surveil

18 the police?

19 A.  Yes, Mr. Alowemer made references to surveilling.  I

20 believe he stated the infidel police.

21 Q.  The infidel police.

22      Following the fourth meeting where the plans were

23 discussed, the supplies were provided, per your testimony,

24 correct?

25 A.  Yes, ma'am.

1  Q.  And the maps?

2  A.  Yes, ma'am.

3  Q.  Did the defendant make subsequent purchases of supplies

4  that would be needed for the bomb?

5  A.  Yes, ma'am.

6         So, following the fourth in-person meeting,

7  Mr. Alowemer and the UCE continued to engage in online

8  communications or communications via secure apps.  Mr. Alowemer

9  stated that he would purchase nails to be used in the

10  construction of the IED.

11 Q.  Did he, in fact, purchase nails?

12 A.  Yes, ma'am, he did.

13 Q.  On one occasion or more than one occasion?

14 A.  Multiple occasions.  Additionally, during that fourth

15 meeting, Mr. Alowemer and the UCE in addition to discussing the

16 components necessary for the construction of the device, they

17 discussed the manner in which the items should be purchased,

18 specifically, purchased in small quantities, purchased using

19 cash, at different times, at different dates, and from

20 different locations.

21        So following that meeting, the fourth in-person

22 meeting, that weekend I believe it was June 15th and 16th,

23 Mr. Alowemer was observed purchasing nails on multiple

24 occasions.

25 Q.  Observed by the FBI?

1  A.  That's correct.

2  Q.  Special Agent Morgan, were there plans to meet a fifth

3  time?

4  A.  Yes, ma'am.  The fifth meeting occurred on Wednesday, June

5  19th.

6  Q.  What happened at the meeting on the 19th?

7  A.  At that meeting, Mr. Alowemer arrived, he again met with

8  the UCE and they further discussed the plot.

9  Q.  Was he arrested at some time in conjunction with that

10  meeting?

11  A.  Yes, that was the fifth and final meeting which culminated

12  in Mr. Alowemer's arrest.

13  Q.  Did the defendant bring anything to the fifth meeting that

14  culminated in his arrest?

15  A.  Yes.  So en route to that fifth meeting, Mr. Alowemer was

16  observed, again by FBI personnel, purchasing nails.  And

17  Mr. Alowemer, when he was arrested, there was a search executed

18  of his vehicle and I believe three boxes of nails were located

19  in this vehicle.

20        Additionally, at the time of his arrest, Mr. Alowemer

21  was wearing a ring, again, with the Islamic State insignia that

22  was identical to the rings that he earlier provided to the UCE

23  and CHS as gifts.

24  Q.  At a prior in-person meeting?

25  A.  That's correct.

1  Q.  Special Agent Morgan, did the defendant give post-arrest

2  statements?

3  A.  He did.

4  Q.  Did he make statements incriminating himself and the plot

5  to bomb the church?

6  A.  Yes.  Mr. Alowemer stated he knew what he was doing were

7  terrorist acts and that he could be arrested for doing those

8  things.

9  Q.  Did the defendant affirm his communications online with

10 the OCE, the UCE and the CHS?

11 A.  Mr. Alowemer stated he communicated online with the OCE

12 and the UCE.  He confirmed that he met in person.  He stated

13 that he prepared a bayáa video which he provided to the OCE.

14 Q.  Did he in the course of this interview talk about some of

15 those bomb-making forums or having access to the instruction

16 manuals or the materials --

17 A.  Yes, Mr. Alowemer admitted that he provided the UCE with

18 those two documents, the instruction manual for the Young

19 Mujahedeen as well as the construction of the ECS explosive

20 device.

21 Q.  In the interview, Special Agent Morgan, did the defendant

22 admit to writing the handwritten ten-point plan?

23 A.  Yes, ma'am.

24 Q.  And providing it to the UCE?

25 A.  Yes, ma'am.

1  Q.  Now, Special Agent Morgan, in the course of this

2  interview, you said that the defendant made incriminating

3  statements.  Was there also an effort on his part to deflect or

4  minimize his actions and behaviors?

5  A.  Yes, ma'am.

6  Q.  Can you explain that.

7  A.  Mr. Alowemer stated he felt pressured in some way.  I

8  don't believe he articulated further than that, but

9  Mr. Alowemer also stated that he felt an inner drive to carry

10  out this attack.

11  Q.  Special Agent Morgan, were there some searches conducted

12  in conjunction with the arrest of the defendant?

13  A.  Yes, ma'am.  In addition to the search of Mr. Alowemer's

14  vehicle, a search was conducted of Mr. Alowemer's residence.

15  Q.  Were there, and it can be a summary, were there some items

16  that corroborated the actions that had taken place to that

17  point?

18  A.  Yes, ma'am.  So when Mr. Alowemer prepared his bayáa

19  video, he asked the OCE if he could wear a mask while making

20  the video.  The video is depicted in the still images as well

21  as the video that he provided to the OCE.  That mask was

22  recovered from Mr. Alowemer's residence.

23        Additionally, in Mr. Alowemer's bayáa video, there's

24  what appears to be a printout of the Islamic State flag, the

25  Black Standard over Mr. Alowemer's right shoulder what appears

1  to be taped to a white wall.  That printout was recovered as

2  well.

3          Additionally, Mr. Alowemer on at least one occasion

4  when he met in person with the UCE, he had a notebook and he

5  would pull documents from that notebook and then on that

6  notebook in at least two locations, there's -- it's either a

7  printout or sketch of the Black Standard.  That notebook was

8  recovered as well.

9  Q.  From his home?

10  A.  Yes, ma'am.

11          Additionally, Mr. Alowemer's father consented to a

12  search of his vehicle.

13  Q.  But nothing you testified about was found there?

14  A.  No, nothing was recovered from Mr. Alowemer's father's

15  vehicle.

16  Q.  Now, Special Agent Morgan, you've reviewed some exhibits

17  before coming to court today?

18  A.  Yes, ma'am.

19  Q.  Did they include the bayáa video and a truck bomb video

20  that you've described?

21  A.  Yes, ma'am.

22          MS. SONG:  If we could please show Exhibit 1.

23      (Video was played in open court.)

24  BY MS. SONG:

25  Q.  Special Agent Morgan, that is the video that you've

1  described and testified to?

2   A.   Yes, ma'am, that's the bayáa video.

3          MS. SONG:   If you would play Exhibit No. 2.

4        (Video was played in open court.)

5          MS. SONG:   Your Honor, I'd offer Exhibits 1 and 2,

6  which are still shots from the videos that were just played in

7  court.

8          THE COURT:   Any objection?

9          MR. SAYLOR:   Your Honor, not at this time.

10          THE COURT:   They're admitted.

11          MS. SONG:   Those are all my questions, Your Honor.

12          THE COURT:   Would defense like to cross-examine?

13          MR. SAYLOR:   Yes, Your Honor.   May I have a moment

14  just to review?

15          THE COURT:   You may.

16          MS. SONG:   Your Honor, the government also proffers

17  the criminal complaint.

18          THE COURT:   As an exhibit?

19          MS. SONG:   Yes.

20          THE COURT:   The criminal complaint is admitted.   That

21  would be Exhibit 3.

22                    CROSS-EXAMINATION

23  BY MR. SAYLOR:

24   Q.   Special Agent Morgan --

25          MR. SAYLOR:   Before I begin, I wonder if I could sit

1  down during cross-examination because of the injury on my leg?

2          THE COURT:  You may.

3  BY MR. SAYLOR:

4  Q.  Special Agent, so we just covered a lot of testimony there

5  so I'll sort of go step by step.

6          As an overview, though, just to confirm, no explosive

7  devices were actually planted anywhere; is that correct?

8  A.  That's correct, we disrupted the plot before the devices

9  could be planted.

10 Q.  So the answer is no.

11         No explosive devices were actually made at any point?

12 A.  That's correct, the plot was disrupted before the devices

13 could be created.

14 Q.  No attempts to actually plant an explosive device in that

15 no one was bringing an explosive device anywhere at any point

16 in this investigation?

17 A.  That's correct, Mr. Alowemer stated an unspecified date in

18 July for the execution of the plan.

19 Q.  So it's supposed to be for July?

20 A.  Yes, sir.

21 Q.  Why was it July?

22 A.  I don't know if he felt the need to gather further

23 components, if he wasn't prepared operationally, if he wanted

24 to conduct further surveillance, I don't know.

25 Q.  Was July suggested by the UCE or --

1    A.   Not to my knowledge, no.

2    Q.   Did they have conversations about why it was July, to your

3    knowledge?

4    A.   No.

5    Q.   At that point, and I know we're kind of going in reverse

6    order but I'll sort of dive right in.

7             At that point in the investigation, after the third

8    meeting, and the third meeting is on July 11; is that correct?

9    A.   I believe that's the correct date.

10   Q.   At the third meeting, you have my client, Mr. Alowemer,

11   under surveillance pretty much 24/7?

12   A.   Mr. Alowemer was under extensive surveillance.

13   Q.   When did that start?

14   A.   I don't know the exact date.  I believe it was around

15   Easter of this year.

16   Q.   So late April?

17   A.   Yes.

18   Q.   At this point, you know where he lives?

19   A.   Yes, sir.

20   Q.   At this point, are you surveilling anyone else?

21   A.   With respect to this investigation, no, sir.

22   Q.   Mr. Alowemer is communicating with your undercover

23   operatives virtually every day?

24   A.   On a near daily basis, yes, sir.

25   Q.   Can I just go back.  You said you're familiar with the

1  complaint, you are part of the Joint Terrorism Task Force; is

2  that correct?

3  A.  Yes, sir.

4  Q.  You were involved in this investigation personally?

5  A.  I conducted investigative activity in furtherance of this

6  investigation, yes, sir.

7  Q.  When did your involvement begin personally with this

8  investigation?

9  A.  It would have been during the initial surveillances toward

10  the end of April.  In addition to the surveillances, I was

11  involved in the execution of the search warrant on the morning

12  of June 19th.  I was the agent who made contact with

13  Mr. Alowemer's family and explained to them what was going on.

14  Q.  You said the search warrant June 19th, what was that a

15  search warrant of?

16  A.  That was a search warrant -- there was a search of

17  Mr. Alowemer's vehicle, and there was a search of

18  Mr. Alowemer's residence.

19  Q.  Mr. Alowemer's father's vehicle, is that correct, or was

20  it Mr. Alowemer's vehicle?

21  A.  It was Mr. Alowemer's vehicle.  Mr. Alowemer's father

22  consented to a search of his vehicle.  That search was

23  conducted as well.  So there was a search warrant for two

24  items, Mr. Alowemer's vehicle, the family home, and then

25  separate from the search warrant, the father consented to a

1  search of his vehicle that morning.  He volunteered that.

2  Q.  You say "he"?

3  A.  The father said:  If you want to search my vehicle, you

4  can search my vehicle.

5  Q.  Nothing was recovered from that vehicle, correct?

6  A.  No.

7  Q.  Nothing was recovered from the house?

8  A.  The items recovered -- there were a number of items

9  recovered from the house, in excess of 40 items in addition to

10  the items I stated earlier being the mask that Mr. Alowemer

11  wore during his bio video, the flag that is visible in his

12  video, as well as the notebook containing the Islamic State,

13  the Black Standard flag from which he, Mr. Alowemer, was taking

14  documents during the course of the meetings with the UCE.

15  Q.  You said you were involved in that search warrant -- you

16  were involved in execution of that search warrant, correct?

17  A.  Yes, sir.

18  Q.  Are there any items discovered of interest to the FBI that

19  were not mentioned on direct examination?

20  A.  Well, there were a number of items recovered.  A lot of

21  that material -- I believe all of it is still being reviewed,

22  analyzed, translated.

23  Q.  So there are other items pertinent to this

24  investigation --

25  A.  Yes, sir.

1  Q.  -- that are being analyzed right now?

2  A.  Yes, analyzed, reviewed, translated.

3  Q.  You mentioned that my client -- when my client was

4  arrested, where was he going?

5  A.  He was going to -- he was arrested at a meeting location

6  with the UCE north of Pittsburgh.

7  Q.  He was arrested during the meeting?

8  A.  Yes, sir.

9  Q.  A number of FBI agents, I assume, came in and effected the

10  arrest?

11  A.  I would assume.  I wasn't present at the arrest, but I

12  would assume so, yes.

13  Q.  You testified on direct based on conversations that you

14  have had with other agents?

15  A.  That's correct.

16  Q.  Was there any writing that you reviewed other than the

17  criminal complaint?

18  A.  No.  Some search warrant documents, the criminal

19  complaint, that's the extent of my review of this material.

20  Q.  These discussions with other agents, were those ever

21  memorialized in writing?

22  A.  No, sir.

23  Q.  In terms of his arrest, he was taken to an FBI holding

24  cell?

25  A.  Yes, sir.  Mr. Alowemer was transported back to FBI

1 Pittsburgh headquarters where he was interviewed.

2 Q.   How long did he sit there before he was interviewed?

3 A.   How long did he sit there at the arrest location?

4 Q.   How long did he sit in the cell before he was interviewed?

5 A.   I don't believe he was taken to a cell.  From the arrest

6 location he was transported back to FBI Pittsburgh

7 headquarters.  He was taken to an interview room and he was

8 interviewed.  From there, he was brought either the marshals'

9 or the court.  I believe the interview lasted maybe 90 minutes,

10 an hour; it was brief.

11 Q.   Can you estimate elapsed time between the time he was

12 arrested and the time the interview began?

13 A.   The amount of time it would have taken to drive from the

14 meeting location north of Pittsburgh to our office on the South

15 Side, I would say 20, 30 minutes at that time of day.

16 Q.   So the interview began immediately?

17 A.   The interview began when Mr. Alowemer was transported to

18 our office.  Mr. Alowemer was Mirandized.  He was Mirandized --

19 he signed a Miranda form both in English and Arabic and

20 Mr. Alowemer was asked if he would like the assistance of an

21 Arabic translator, and Mr. Alowemer declined that offer.

22 Q.   Did he sign the Miranda form in English or in Arabic?

23 A.   I don't know that.  I believe he signed both forms,

24 whether he signed in English or Arabic, that I don't know.

25 Q.   But during the interview, you indicated that he -- he did

1 not need a translator, did not request one?

2  A.  He was offered the services of a translator and

3 Mr. Alowemer declined that offer.

4  Q.  Was the interview in Arabic?

5  A.  No, the interview was in English.

6  Q.  Did the translator stay in the room while the interview

7 was conducted?

8  A.  A translator wasn't provided as Mr. Alowemer declined that

9 offer of assistance.

10  Q.  Was he asked in Arabic whether he wanted a translator?

11  A.  I don't know if he was asked in Arabic.  I suspect not,

12 but, again, he signed the form in English, he signed the

13 Miranda form in Arabic, and he was asked if he wanted an Arabic

14 translator.  In addition, in the communications with the OCE

15 and the UCE, Mr. Alowemer spoke in both English and Arabic.

16  Q.  My client is utilizing a translator now, correct?

17  A.  Yes, sir, that's correct.

18          MR. SAYLOR:  One moment, Your Honor.

19 BY MR. SAYLOR:

20  Q.  In learning about this case, in preparation for this

21 hearing, did you speak directly to the online covert employee

22 or the undercover covert employee?

23  A.  No, sir.

24  Q.  In making this distinction between the OCE and UCE?

25  A.  That's correct.

1  Q.  I want to ask just a question about that.

2        The online covert employee is a member of the

3  community?

4  A.  No, they're both FBI employees.  The OCE and the UCE are

5  FBI employees.

6  Q.  Are they both agents?

7  A.  The UCE would be an agent.  The OCE is likely an agent as

8  well.  The OCE might be a task force officer.  I don't know.

9  Q.  You don't know in this case?

10  A.  I don't know the identities of the OCE, the UCE, I have no

11  idea.

12  Q.  The FBI follows practices for utilizing online covert

13  employees and undercover covert employees, correct?

14  A.  That's correct, undercover employees go through an

15  undercover school.  OCE, online covert employees, they go

16  through training as well.

17  Q.  That is their full time job, to be an OCE or UCE?

18  A.  That -- I'm neither.  I have no idea.  It may be a

19  collateral duty, depending on the workload of the FBI employee.

20  Q.  They have a contract with the FBI?

21  A.  Well, if they're employees, they wouldn't have a contract,

22  they would be employees.

23  Q.  Do they get paid by the number of persons they put in

24  contact with an undercover agent?

25  A.  No.

1  Q.  Do you know how they're paid?

2  A.  Employees, they're paid as any other employee would be

3  paid.

4  Q.  Does the FBI utilize, in this case, I want to talk about

5  this case.

6  A.  Okay.

7  Q.  Does the FBI have an agent who handles or monitors the

8  activities of the OCE?

9  A.  Yes, there would be a handling agent.

10 Q.  That agent monitors the online activity of the online

11 covert?

12 A.  I don't know what the responsibilities of the handling

13 agent are.  I do know there's a handling agent involved.

14 Q.  There's a handling agent in this case?

15 A.  Yes, sir.

16 Q.  The OCE, the online covert employee was using a Smartphone

17 to connect or to communicate with targets of interest?

18 A.  I don't know what type of device, but certainly some sort

19 of device, yes.

20 Q.  Are those communications monitored by the FBI?

21 A.  Generally, communications between an online covert

22 employee and a subject are captured through screen shots.

23        In this instance, however, in communicating with

24 Mr. Alowemer, he was frequently changing his handles and his

25 facilities, so that level of operational security provided some

1 difficulty in ensuring the capture of all those communications.

2  Q.  So you're saying in this case that not all of the

3 communications between -- the alleged communications between my

4 client and the OCE were captured?

5  A.  I believe every best effort was made to capture all the

6 communications.  I couldn't state the volume of communications

7 that were captured, what wasn't captured, I don't know that

8 answer.

9  Q.  The question is, so you believe that not all

10 communications between, alleged communications between my

11 client and the online covert employee were captured?

12  A.  Do I believe they were captured?  Yes, I believe they were

13 captured.  The added difficulty was the operational security

14 mechanisms employed by Mr. Alowemer.  As far as I know, those

15 were captured as well, but it presented additional

16 difficulties.  I don't know if he was telling the OCE I'm now

17 contacting you from this user name, or this vanity, and then

18 how that communication occurred, I don't know.

19  Q.  Didn't you just say all the communications from the OCE

20 are monitored by the FBI?

21  A.  The OCE -- I believe I stated to the extent possible,

22 they're all captured and monitored.  Captured would probably be

23 more of an appropriate characterization than monitored.  I'm

24 not an OCE so I don't know the procedures that would pertain to

25 that.

1  Q.  But the job of the FBI handler of the OCE would be to

2  monitor the communications of the OCE?

3  A.  I don't know if that would be the handler's responsibility

4  or the OCE's responsibility, if they're captured in another

5  manner, I don't know.

6  Q.  So to sum up, in this investigation, not all of the

7  communications between the OCE and my client were captured by

8  the FBI?

9  A.  I don't know that to be true.

10  Q.  Is that fair to say?

11        MS. SONG:  Objection, Your Honor.  That is not what

12  the witness has said, so it's an inaccurate restatement of the

13  summary of his testimony.

14        THE COURT:  Your objection is sustained.

15        Do you have a question for the witness?

16        MR. SAYLOR:  Yes, Your Honor.

17  BY MR. SAYLOR:

18  Q.  How do you know it was hard to capture?

19  A.  Through my conversations -- I shouldn't say I know it was

20  hard to capture.  Through my conversations with the

21  investigative team, it was stated that Mr. Alowemer would

22  frequently change his handles and his vanities in communicating

23  with the OCE.

24  Q.  What social media platforms would my client allegedly use?

25  A.  As I stated earlier, he used a number of social media

1 platforms to include Facebook, SoundCloud, I believe Instagram.

2  Q.  But they would all go to one point over here, the OCE,

3 correct, the same social media platform there the OCE --

4          MS. SONG:  I'm going to object, Your Honor.  That is

5 not what the witness has said, and it sounds as if defense

6 counsel is trying to paraphrase what the witness said and

7 that's inaccurate.

8          THE COURT:  I'm going to sustain the objection.

9          I would just like to remind counsel this is a probable

10 cause hearing, not a discovery hearing, and to tailor your

11 questions with a probable cause finding.

12          MR. SAYLOR:  I understand, Your Honor.  I'm just

13 trying to get the intent of my client, which is an element of

14 the offense here.

15          THE COURT:  I'm not sure the FBI handler would know

16 that or not.  Why don't you move on to a topic that would be

17 toward the probable cause.

18          MR. SAYLOR:  Thank you, Your Honor.

19 BY MR. SAYLOR:

20  Q.  Is there anything to stop the OCE from deleting a message?

21  A.  I don't know.

22  Q.  Nothing?

23  A.  I don't know.

24  Q.  The earliest conversation between the OCE and Mr. Alowemer

25 was March of '19, correct?

1    A.   Yes, sir.

2    Q.   Did you see or are you familiar with any threats that the

3    OCE made to Mr. Alowemer during the course of this

4    investigation and their online communications?

5    A.   No.

6    Q.   Have you seen all the screen shots or the captures of

7    communications between Mr. Alowemer and the OCE?

8    A.   I have not seen all of them.  I've seen the communications

9    that are outlined in the complaint.

10   Q.   Mr. Alowemer never presented himself to be a bomb expert;

11   is that correct?

12   A.   That's correct.

13   Q.   In fact, the UCE, the undercover covert employee,

14   presented him or herself to be a bomb expert?

15   A.   That's correct.  Yet still, Mr. Alowemer was providing the

16   UCE with those documents I mentioned earlier that pertained to

17   the construction of explosive devices.

18   Q.   What kind of bomb expert was the UCE presenting him or

19   herself to be?

20   A.   An individual capable of producing IEDs; beyond that, I

21   don't know.

22   Q.   Yet the UCE asked to receive more information about the

23   manufacture --

24   A.   No, those documents that Mr. Alowemer provided were

25   without solicitation from the UCE.

1  Q.  The UCE never asked Mr. Alowemer for any bomb-making

2  materials, written or otherwise?

3  A.  That's correct.

4  Q.  Did the OCE ever ask Mr. Alowemer for any bomb materials,

5  written or otherwise?

6  A.  Not to my knowledge.

7  Q.  So it was unprompted?

8  A.  Mr. Alowemer providing those documents?

9  Q.  Yes.

10  A.  As far as I know, yes.

11  Q.  Did the UCE at the fourth meeting suggest to Mr. Alowemer

12  to bring maps of Pittsburgh, as referenced in the exhibits

13  here?

14  A.  No, Mr. Alowemer did that of his own accord without any

15  prompting from the UCE.

16  Q.  Did the UCE suggest that Mr. Alowemer should write this

17  note as seen in the exhibits?

18  A.  No, that was provided, again, without prompting from the

19  UCE, the plan was Mr. Alowemer's from beginning to end.

20  Q.  From beginning to end?

21  A.  Yes, sir.

22  Q.  There are documented communications online between the UCE

23  and Mr. Alowemer?

24  A.  Yes, sir.

25  Q.  Just to be clear, as would the OCE, the FBI was unable to

1  capture all of those communications, correct?

2          MS. SONG:  Objection.  That has not been broached to

3  this point.  That's a misstatement of the question, not a fact.

4          THE COURT:  The objection is sustained.

5          Ask the witness a question rather than asking him if

6  he agrees with what you're summarizing is his statement.

7  BY MR. SAYLOR:

8  Q.  Did the -- I lost my train of thought -- did the UCE and

9  Mr. Alowemer have discussions online?

10  A.  Yes.

11  Q.  Are those discussions captured by the FBI in this

12  investigation?

13  A.  They're clearly captured in some form as evidenced by the

14  presence in the complaint.

15  Q.  Beyond what is seen in the complaint, are there other

16  discussions or other interactions online that are captured by

17  the FBI?

18  A.  Yes.  What is in the complaint is a summary of the

19  communications between Mr. Alowemer and the UCE or the OCE.

20  Q.  Are there discussions online between the UCE and

21  Mr. Alowemer that are not captured by the FBI?

22  A.  That are not captured; not to my knowledge.

23  Q.  They're all captured by the FBI?

24  A.  I would believe so, yes.  In some form, yes.

25  Q.  Do you know?

1  A.  I don't know.

2  Q.  Is there someone that is in the investigation that would

3 know?

4         MS. SONG:  Your Honor, this is going into discovery.

5         THE COURT:  I'll sustain the objection and instruct

6 counsel to move on.

7         MR. SAYLOR:  Very good.

8 BY MR. SAYLOR:

9  Q.  The discussion of a timer here, Mr. Alowemer never offered

10 himself to be an expert in timers, correct?

11 A.  That's correct.

12 Q.  In fact, the UCE offered themselves to be an expert in

13 timers?

14 A.  The UCE presented as an expert -- as an individual capable

15 of producing IEDs.  The timer was one of the components that

16 Mr. Alowemer agreed to purchase to delay the detonation of the

17 device.

18 Q.  The UCE said something like, in this -- sorry.  Strike

19 that.

20         In these alleged conversations between Mr. Alowemer

21 and the UCE, the UCE suggested that Mr. Alowemer go get a

22 9-volt battery because that was necessary for the timer?

23 A.  They discussed the components necessary for the

24 construction of the device and Mr. Alowemer agreed to purchase

25 nails, nail polish containing acetone as a precursor for the

1 device, ice packs, which would contain another precursor

2 element, and batteries for the timer.

3 Q.  Is that all that was purchased for these alleged devices?

4 A.  To the best -- yes.

5 Q.  Did the UCE or anyone from the FBI --

6 A.  In addition to nails, nails were purchased as well.

7 Q.  Thank you.

8       Did anyone from the FBI, including the UCE or the CHS,

9 CHI?

10 A.  CHS.

11 Q.  CHS purchase any items and bring them to any meetings?

12 A.  No.

13 Q.  Were any other items requested of Mr. Alowemer to bring to

14 a meeting, other than acetone, nails, 9-volt batteries, ice

15 packs?

16 A.  No.  That was a discussion they had together and it came

17 to the agreement that those were the necessary components, to

18 which Mr. Alowemer agreed to make those purchases.

19 Q.  There are more components to making a destructive device,

20 correct?

21 A.  I'm not an explosive expert.  I'm sure there are a number

22 of components that can be added to a device like that, but, to

23 me, that sounds like the items necessary to begin building a

24 device.

25 Q.  That's all you need for a bomb is those four ingredients?

1  A.  I couldn't speak to that.

2  Q.  From your training and experience, do you know if there

3  are more ingredients that are necessary to make a bomb?

4  A.  I believe those items would constitute an explosive

5  device.  I have no formal training in the construction of

6  explosive devices.

7  Q.  You said you have 16 years with the FBI?

8  A.  Yes.  We have special agent bomb technicians who handle

9  those matters.  We have an FBI laboratory that handles

10 explosive ordnance, so as an agent in the field when those

11 services are needed, there are professionals who handle those

12 matters and are subject matter experts that I would call upon

13 as an investigative agent.

14 Q.  Did a bomb technician agent review this case?

15 A.  There were multiple bomb technicians involved in this

16 investigation.

17         In addition to the material provided by Mr. Alowemer

18 being sent to the FBI laboratory and their conclusion that the

19 information provided would result in the construction of a

20 device that would kill or injure individuals.

21 Q.  Can I go to the June 11 meeting.  I know I'm skipping

22 around here, but that's how my brain works for now.

23         The handwritten instructions in Arabic, the UCE saw

24 Mr. Alowemer write these instructions?

25 A.  No.  The UCE was present at the meeting with Mr. Alowemer

1  and as Mr. Alowemer was going through those points, he was

2  ticking each one off as it was discussed.

3  Q.  By "ticking them off," you mean in realtime with the UCE

4  he was Xing them out?

5  A.  Yes, sir.

6  Q.  So he would --

7  A.  As an indication that that matter has been addressed and

8  discussed.

9  Q.  Okay.  Were there other copies made of that between the

10 UCE, Mr. Alowemer, anyone else in the FBI?

11        MS. SONG:  Your Honor, I don't see how that bears on

12 the probable cause.

13        THE COURT:  Counsel, would you like to explain?

14        MR. SAYLOR:  Again, it goes to my client's intent.

15        THE COURT:  I'm going to sustain the objection.

16 BY MR. SAYLOR:

17 Q.  You indicated my client prior to the FBI or the UCE giving

18 my client a cell phone, he was using other communication

19 devices?

20 A.  Yes.

21 Q.  Were those --

22 A.  Other devices, I don't know if he was using other devices.

23 He was using other social media platforms such as Facebook,

24 Instagram to communicate.

25 Q.  Those communications are made by either a computer or

1  phone?

2  A.   Yes, which device he was using to make those

3  communications, I don't know.

4  Q.   Were though devices --

5  A.   He requested a communication device from the OCE to engage

6  in secure communications.

7  Q.   Were those devices ever seized by the FBI?

8  A.   A number of electronic devices were seized by the FBI.

9  Q.   They're being investigated now?

10  A.   Yes, there are items that will be reviewed, analyzed,

11  translated, as needed.

12  Q.   At the time of his arrest, you indicated that Mr. Alowemer

13  was under pretty constant surveillance, correct?

14  A.   He was under extensive surveillance, yes.

15  Q.   Was he messaging anyone else other than members of the

16  FBI, or what turned out to be members of the FBI about

17  ISIS-related things?

18  A.   The surveillance he was under was physical surveillance.

19  He was under physical surveillance nearly around the clock,

20  other than I believe when he was sleeping.

21  Q.   He didn't meet with anyone else apart from the FBI or what

22  turned out to be the FBI about any ISIS-related matters?

23  A.   No.

24  Q.   The communications in this case were both in English and

25  Arabic, correct?

1  A.   Yes.

2  Q.   The communications were all via social media?

3  A.   I believe they transitioned to utilizing a messaging

4  application that was encrypted peer-to-peer encryption.

5  Q.   There were FBI translators used to interpret what the FBI

6  agents received in this case, correct?

7  A.   Anything that would have been in Arabic, the services of

8  the translator and FBI translator would have been utilized,

9  yes.

10  Q.   There was a single translator in this case or multiple

11  translators?

12  A.   Multiple translators.

13  Q.   The translators, has their work or their interpretations

14  been reviewed by another translator?

15  A.   I believe so, yes.

16  Q.   Is that indicated in the written materials that indicated

17  saying this translator had this interpretation and then the

18  second translator reviewed it?

19  A.   Not that I've seen, but I believe that's the procedure.

20  When the translators work, they work together.  In particular,

21  if they're doing what we would call verbatim translation of a

22  long communication, it would be a quality control check,

23  essentially.

24  Q.   The terms nafir and bay'aa, he used these words with the

25  OCE, correct?

1  A.  Yes.

2  Q.  Are you aware of any alternate meaning of these words?

3  A.  No.  In this context, of this investigation, those terms

4  pertaining to travel to wage jihad and swearing allegiance in

5  this case to al-Baghdadi in the Islamic State.

6  Q.  But in general, using those words does not necessarily

7  mean that you are pledging your allegiance to ISIS?

8  A.  In my experience, the only people who make those types of

9  videos are individuals pledging their allegiance to an

10 extremist organization.

11 Q.  What about other Arabic phrases or terms used in the

12 written communications in this case, the question is, are there

13 alternate translations?

14 A.  I don't -- no.  Everything was taken in the context of the

15 conversation.

16 Q.  You're saying there's only one translation for everything

17 that was written in Arabic in this case?

18 A.  Yes.

19 Q.  There's no disagreement between translators?

20 A.  Not that I'm aware of.

21 Q.  If there is a disagreement, is that noted in the

22 paperwork?

23 A.  I would believe if there's a disagreement, it would be

24 resolved to ensure that the information is represented in the

25 most accurate manner possible.

1 Q.  Is it taken to a chief translator?

2           MS. SONG:  Your Honor, this is getting far afield.

3           THE COURT:  I'll sustain the objection.

4           If you want to start to wrap it up as to probable

5 cause.  There will be more of an opportunity for discovery at a

6 later time.

7           MR. SAYLOR:  Yes, Your Honor.

8 BY MR. SAYLOR:

9 Q.  Just to be clear, a translator is a different person than

10 the online covert employee, right?

11 A.  That's correct.

12 Q.  A different person than the undercover covert employee?

13 A.  That's correct.  We have a number of employees and a

14 number of positions who are fluent Arabic speakers.

15 Q.  All writings that were allegedly produced by my client

16 were translated by translators for the FBI?

17 A.  Yes.  If they have not yet been translated, everything is

18 in the process of being translated.  For instance, from the

19 search, if there are items in Arabic, those may not have been

20 translated to date, but they will be translated.

21 Q.  Except there were communications in this case that were

22 translated by the OCE, isn't that right, and then given to the

23 FBI?

24 A.  I'm not aware of that.

25 Q.  You said you're familiar with the complaint; is that

1 correct?

2 A.  Yes.

3 Q.  Do you want to look at Paragraph 16.

4        If it would help to refresh your recollection, I'll

5 direct your attention to Paragraph 16.

6        Just look up when you're done.

7 A.  Yes, all communications were conducted in Arabic and

8 translated by the OCE.

9 Q.  Are those communications then translated by a translator?

10 A.  That I don't know.  The OCE could very well be an

11 individual, an FBI employee who is certified in the Arabic

12 language.

13 Q.  These communications were originally in Arabic?

14 A.  Evidently, yes.

15 Q.  And supposedly messaged by my client, correct?

16 A.  Yes.

17 Q.  Are the original Arabic writings turned over to the FBI

18 and kept?

19 A.  These would have been captured likely via screen shots, so

20 they would be maintained, yes.

21 Q.  In this case, you're positive that OCE --

22        MS. SONG:  Objection, Your Honor.  We've covered this

23 ground.

24        THE COURT:  I sustain the objection.  Again, that's

25 getting into discovery.

BY MR. SAYLOR:

Q.  Did a translator review the OCE's translation of my client's alleged writing?

A.  I don't know that.  As I said before, the OCE could very well be an FBI employee who is a certified Arabic speaker.

MR. SAYLOR:  If I can just have a moment.  I'm nearly done.

(Whereupon, there was a brief pause in the proceedings.)

BY MR. SAYLOR:

Q.  It's true during the interview with my client, Mr. Alowemer, that he indicated to yourself or other FBI agents that he felt threatened by people online to conduct these activities?

A.  He did not say threatened.  He said he felt pressured, but he also felt an inner drive to carry out this attack.

Q.  Did he say anything more other than feeling pressure?

A.  Not to my knowledge, no.

Q.  Did you ask how he felt pressured?

A.  I didn't have contact with Mr. Alowemer.

Q.  Do you know if any other agents asked how he felt pressured?

A.  I don't believe he articulated it further.

MR. SAYLOR:  Your Honor, I believe I have no further questions.  Thank you.

THE COURT:  Any further redirect?

1         MS. SONG:  Just one question, Your Honor.

2                   REDIRECT EXAMINATION

3   BY MS. SONG:

4   Q.   Special Agent Morgan, to the extent you were asked

5   questions about communications between the defendant and the

6   OCE, UCE and the CHS, did you attempt to respond to those

7   questions to the best of your knowledge based on your

8   preparation for this hearing today?

9   A.   Yes, I did.

10  Q.   Is it a fact that you have not reviewed every single

11  communication that occurred from March to present day --

12  A.   That's correct.

13  Q.   -- with the defendant and those individuals?

14  A.   That's correct.

15        MS. SONG:  That's all, Your Honor.  Thank you.

16        THE COURT:  Would counsel like to make an argument of

17  probable cause?

18        MS. SONG:  Yes, Your Honor.  We have strong PC in this

19  case.  There's a very long course of conduct that involved

20  online expressions of an intent to commit violent acts on

21  behalf of ISIS and four in-person meetings where that plot was

22  refined and the target specified.  There was escalation in this

23  case by the defendant in terms of the specificity and the

24  lethality that he intended.  We know this because the defendant

25  wrote his intentions beginning in March with the UCE.  We know

1 that he wrote his plan to bomb a church --

2        THE COURT:  Excuse me just a moment.

3        THE INTERPRETER:  The interpreter asks if she could go

4 item by item.

5        MS. SONG:  Are you current presently?

6        THE INTERPRETER:  Go back one.

7        MS. SONG:  The defendant wrote his intentions online

8 beginning in March with the OCE.

9        He handwrote his own plan to bomb the church on the

10 North Side in the name of ISIS and to proclaim we arrived.

11        He wrote his own ten-point guide with checkmarks to

12 mark when he covered each item with the UCE.

13        He determined where they would park, how he's going to

14 place the backpack with the bomb.

15        He assigned the CHS to watch the police station.

16        And he had prepared their alibi and their getaway.

17        This defendant affirmed his intent in person four

18 times telling the UCE why he chose the church and how he wanted

19 others in the United States to rise up in the name of ISIS.

20        This defendant affirmed his intention with his

21 behavior and his actions.  He purchased nails.  He printed

22 maps.  He found explosives instructions online and he sent the

23 Beginner's Course for the Young Mujahedeen and Manufacturing

24 the Easiest Explosive Devices to the man he knew to be a bomb

25 maker.

1          This defendant is not charged because of his thought

2    or his speech, he is in court today because of his actions.  He

3    scouted, he plotted, he researched, he surveilled, he printed

4    maps, he wrote a plan, he drove by the location.

5          THE COURT:  Just a moment, please.

6          THE INTERPRETER:  The interpreter would ask if he

7    could go back and just do that again.  Sorry.

8          MS. SONG:  I'll try.

9          He purchased nails.  He printed maps.  He plotted.  He

10   researched.  He surveilled.  He wrote a plan.  He drove by the

11   location.  He bought box after box of nails knowing that they

12   would provide the shrapnel for a bomb that he would leave at

13   the church.

14         He may not have expected church members to be killed,

15   but he was aware that the force necessary to destroy the church

16   would kill people in the area.

17         This defendant affirmed in his post-arrest statements

18   that he had a desire to support ISIS, that he plotted to bomb

19   the church, that he did the research and he made the purchases

20   that were necessary for the device.

21         So on that basis, Your Honor, along with the exhibits

22   and everything else in the complaint and testimony, we believe

23   there's ample probable cause.

24         THE COURT:  Thank you.

25         I'll hear argument from the defense.

1        MR. SAYLOR:  Thank you, Your Honor.

2        I'm just going to argue there's no probable cause, not

3  enough for probable cause that has been presented here today.

4  We do have only one side of the story here.  My client is a

5  young man.  Young men often engage in puffery, engage in

6  bragging, and we can certainly explore his intent at a later

7  time.  My only argument is that supplies that can be bought at

8  a CVS or hardware store do not constitute a substantial step,

9  even at the probable cause level necessarily, to constitute an

10  attempt to provide material support for sources.  He can't make

11  a bomb out of those four things.

12        THE COURT:  Based on the evidence that has been

13  presented in court today, in conjunction with the exhibits and

14  the criminal complaint, as well as the argument made by the

15  government and the defense, I find that the government has

16  established probable cause for the charges in this case.

17        Now, the government is also seeking detention and this

18  is the time for the detention hearing in the case, however, I

19  have a waiver of the right to a detention hearing at this time.

20        Is that consistent with advice of counsel?

21        MR. NOVARA:  Yes, Your Honor.  We're waiving a hearing

22  at this moment reserving our right to seek release later, if

23  appropriate, at an appropriate time.

24        THE COURT:  That's correct.

25        Mr. Alowemer, even though a detention hearing is

1  waived at this time, your counsel may file a motion at a later

2  time for a detention hearing.

3          I am, however, ordering that you be detained until

4  further action of Court.

5          Is there anything further on behalf of the government?

6          MS. SONG:  No, Your Honor.  Thank you.

7          THE COURT:  Is there anything further on behalf of the

8  defendant?

9          MR. SAYLOR:  No, Your Honor.  Thank you very much.

10          THE COURT:  Thank you.

11          We are adjourned.

12      (Court adjourned.)

13

14                          I-N-D-E-X

15  WITNESS                Direct      Cross      Redirect      Recross

16  Gary Morgan              4          38          64           --

17

18

19                          CERTIFICATE

20          I, Juliann A. Kienzle, certify that the foregoing is a
    correct transcript from the record of proceedings in the
21  above-titled matter.

22
    s/Juliann A. Kienzle, RMR, CRR
23  _____
    Juliann A. Kienzle, RMR, CRR
24

25