IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA )
)
v. )                    Criminal No. 19-219
)
MUSTAFA MOUSAB ALOWEMER )

**<u>SENTENCING MEMORANDUM</u>**

I.      INTRODUCTION ........................................................................................... 1

II.     APPLICABLE LEGAL STANDARDS ....................................................... 4

    a.      Generally ............................................................................. 4

    b.      Departures ........................................................................... 5

    c.      Variances ............................................................................. 5

        i.      Mental and Emotional Condition .................................. 6

        ii.     Deportability ................................................................. 7

        iii.    Harsh Conditions of Pretrial Confinement ................. 8

        iv.     Refugee Status and Traumatic Life Events ................. 9

III.    SECTION 3553(a) FACTORS ...................................................................... 9

    a.      Mustafa's History and Characteristics ................................ 10

        i.      Childhood Before Syrian Civil War ............................ 10

        ii.     Syrian Civil War and Family Trauma ......................... 13

        iii.    Refugee Camps and Life in Jordan ............................. 17

        iv.     Asylum and Resettlement in Pittsburgh ..................... 21

        v.      Retriggered Trauma ..................................................... 28

|  | vi. | Acceptance of Responsibility and Remorse ................................ 34 |

        vii.      Experience in Custody and Rehabilitation................................ 35

   b.     Nature and Circumstances of the Offense ............................................ 38

   c.     Sentencing Guidelines ........................................................................... 44

IV.    MR. ALOWEMER SHOULD RECEIVE A DOWNWARD DEPARTURE AND/OR VARIANCE BECAUSE OF HIS MENTAL AND EMOTIONAL CONDITION AT THE TIME OF THE OFFENSE AND HIS DIMINISHED CAPACITY ............................................................................................ 45

V.    MR. ALOWEMER SHOULD RECEIVE A DOWNWARD VARIANCE BECAUSE HE IS FACING DEPORTATION FOLLOWING HIS SENTENCE..................................................................................................... 52

VI.    MR. ALOWEMER SHOULD RECEIVE A DOWNWARD VARIANCE BECAUSE OF THE SYSTEMIC MANIPULATION AND RADICALIZATION OF YOUNG PEOPLE PERPETRATED IN THE MIDDLE EAST AND ON SOCIAL MEDIA.................................................................................. 55

VII.    MR. ALOWEMER SHOULD RECEIVE A DOWNWARD VARIANCE BECAUSE OF THE UNUSUALLY HARSH CONDITIONS OF HIS PRETRIAL CONFINEMENT................................................................. 58

VIII.    MUSTAFA SHOULD BE SENTENCED TO A TERM OF INCARCERATION WITHIN THE NON-3A1.4 GUIDELINE RANGE BECAUSE SUCH A PUNISHMENT WOULD BE COMPARABLE TO SENTENCES RECEIVED BY OTHER INDIVIDUALS ENGAGED IN SIMILAR CONDUCT ............... 60

IX.    CONCLUSION................................................................................................ 64

I.    **INTRODUCTION**

Two weeks before his arrest in this case, Mustafa Alowemer celebrated his graduation from Brashear High School. After coming to the United States with his family in August 2016, he worked extremely hard to complete four years of credits in three years before he aged out of the primary public education system. He was a leader in his classes, helping fellow students learn English like he had. In many ways, he was living a relatively normal teenage life in the United States. He had friends, he drove a car, and he volunteered for a local organization that helped refugees. He had just been accepted to the Community College of Allegheny County ("CCAC") and he was looking forward to getting an engineering degree. On the outside, Mustafa had accomplished so much and come so far from what he and his family had endured before they arrived in the United States.

In early 2011, when Mustafa was 12, he and his family were living in their home city of Dara'a, Syria. At the time, protests across the Middle East erupted in what would become to be known as the Arab Spring. In some countries, the protests and subsequent regime change was relatively peaceful. That was not the case in Syria. When the protests in Syria began in Dara'a, the Syrian military reacted with extremely violent and repressive tactics against the local Sunni Muslim population. The civil war that erupted in Syria obliterated the only happy and secure life Mustafa had known. Soon after the conflict started, soldiers came to his home, threatened him and his family at gun point, and shattered his father's leg. Mustafa, as the eldest child and son, was thrust into the role of provider for his family. He

1

was forced to abandon his schooling and brave the daily dangers of being targeted by Syrian soldiers every time he left his home. The unspeakable atrocities and inhumane treatment that Mustafa witnessed and personally endured left an indelible mark. Outwardly, Mustafa remained strong for his family. But inwardly, he was, in many ways, broken.

In the United States, although he had left his war-torn homeland years before, he continued to closely monitor news on his phone. News reports, videos, and posts by family and friends still in Syria consumed him. Mustafa turned to the deep recesses of the internet to connect with the homeland he felt he had abandoned. During his bouts of depression, he would lock himself in his room unable to eat and obsessively combing through online information about the conflict. He began following Facebook accounts committed to the fight against the Assad-Syrian regime, which included the ISIS forces opposing the Assad regime. Teachers in school observed how his mood would swing based on news he learned online, with one teacher recalling Mustafa showing her photos from his phone of the bloody bodies of his murdered family members. His mental and emotional anguish culminated in an incident on February 12, 2019. That day he learned that family members and friends had been killed in Syria. A teacher overheard him say he wanted to kill himself. He was immediately sent to the nurse's office, where he complained of aches all over his body. He told a school representative about the hopelessness and guilt he felt living in the United States while good people – his people – were dying every day. He was sent home, but he did not seek any follow-up

2

treatment, which is not uncommon among refugees with PTSD. Three-and-a-half weeks after his serious psychotic episode, an undercover FBI agent posing to be a member of ISIS befriended him on Facebook. Three-and-a-half months later, he was in jail, where he remains today.

On September 16, 2021, Mustafa pled guilty to one count of material support of a foreign terrorist organization. Consistent with his immediate and robust admission to FBI agents on the day of his arrest, Mustafa accepted responsibility for his actions, expressed remorse for what he did, and forewent numerous constitutional rights in order to convey to the Court and community how sorry he was for his crime. Close friends and family who have remained in touch with Mustafa submitted letters with this memorandum detailing how he has apologized to them for his actions and acknowledged how misguided he had become in the months leading up to his arrest. He is resigned to his fate of further incarceration and eventual deportation and is ready to receive judgment by this Court.

Defense counsel calculates his advisory Guideline range at 78 to 97 month's imprisonment. The government and probation office calculate his advisory Guidelines at 240 months because they argue that Mustafa is subject to the terrorism enhancement under Guideline Section 3A1.4. Undersigned counsel remain steadfast that the terrorism enhancement does not apply to his case but, regardless how the Court rules on that issue, a sentence within the non-3A1.4 enhancement range is an appropriate resolution in this case. Such a result would be appropriate for four primary reasons. First, Mustafa's mental and emotional

condition at the time of his offense – namely, his well-established PTSD, complex PTSD, and major depressive disorder – warrant a downward departure and/or variance. Second, Mustafa's future immigration consequences as a result of his conviction represent collateral punishment above and beyond that contemplated by the Guidelines, and also serve to mitigate any concerns about future recidivism and danger to the community. Third, the online and social media environment designed and perpetrated by ISIS and similar groups have a long-documented history of distorting religious obligation and recruiting traumatized and disaffect young men like Mustafa. Mustafa fell prey to those forces, and that mitigates his culpability in this case. And lastly, Mustafa's incarceration in local county jails for the past 3.5 years during the COVID-19 pandemic, and as a foreign-born, non-English speaking, Muslim man charged with a terrorism offense resulted in him enduring an unusually harsh term of pretrial confinement that warrants a downward variance. Put together, a sentence between 78 and 97 months, followed by his eventual deportation, would be a sentence consistent with other similar cases around the country and which is sufficient but not greater than necessary to satisfy the purposes of punishment in this case.

## II.  <u>APPLICABLE LEGAL STANDARDS</u>

### a.  <u>Generally</u>

This Court has "broad discretion" in imposing a sentence. *United States v. Booker*, 543 U.S. 220, 233 (2005). While the Court must consider the United States Sentencing Guidelines ("Guidelines") when fashioning a sentence, it may not

presume that a sentence within the advisory Guideline range is appropriate. *Gall v. United States*, 552 U.S. 38, 50 (2007). In that sense, the Guidelines are merely a "starting point" for the Court's consideration of an appropriate sentence. *Id.* at 49.

When imposing a sentence, the Court must ensure that it is "sufficient, but not greater than necessary" to achieve the goals of sentencing, with particular attention paid to the defendant's "history and characteristics." 18 U.S.C. § 3553(a), (a)(1). "In view of the widespread incarceration rates and their unnecessary, deleterious effect on individuals sentenced, their family, society and our economy, parsimony in incarceration is to be prized." *United States v. Ramirez*, 2018 WL 1221129, at *3 (E.D.N.Y. 2018).

**b.** **Departures**

A sentencing court may depart from the applicable Guideline range if there is a mitigating circumstance "of a kind, or to a degree, not adequately taken into consideration [in the] guidelines." U.S.S.G. § 5K2.0. For example, the Court may depart if it finds that the defendant's "mental and emotional conditions[,] … individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines." U.S.S.G. § 5H1.3.

**c.** **Variances**

A sentencing court must consider the relevant Section 3553(a) factors in determining the appropriate sentence. *United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006). Even if a court finds that a particular circumstance does not warrant

a formal departure under the Guidelines, those same facts may nevertheless support a valid basis for a variance below the advisory Guideline range. *See United States v. Vazquez-Lebron*, 582 F.3d 443, 447 (3d Cir. 2009) (finding that district court's consideration of same factors for departure and variance is appropriate).

### i.  Mental and Emotional Condition

As stated above, the Court may consider a defendant's "mental and emotional conditions" in determining whether a departure is appropriate. U.S.S.G. § 5H1.3. Likewise, under Section 5K2.13, a court may depart downward from the advisory Guideline range if "(1) the defendant committed the offense while suffering from a significantly reduced mental capacity; and (2) the significantly reduced mental capacity contributed substantially to the commission of the offense." U.S.S.G. § 5K2.13. If those conditions do not warrant a departure, the Court may nonetheless consider those circumstances when granting a downward variance under Section 3553(a). *See, e.g., Hicks v. United States*, 2017 WL 412644, at *5 (D.N.H. 2017) (noting "the court expressly found that Hick's PTSD warranted a downward variance" in a bank robbery case); *United States v. Oliver*, 2022 WL 2188967, at *4 (M.D. Ala. 2022) (granting downward variance to jail guard who beat handcuffed prisoners because the defendant's PTSD made him "no less deserving of leniency"); *United States v. Lovato,* 798 F. Supp. 2d 1257, 1259-60 (D.N.M. 2011) (downward variance granted in case involving woman with possible PTSD); *United States v. Taylor*, 736 Fed. App'x 216, 222 (11th Cir. 2018) (variance for defendant's PTSD was not an abuse of discretion); *United States v. Elk*, 2021 WL 1575209, at *1

(D.S.D. 2021) (acknowledging the sentencing court granted a "substantial downward variance" after considering – among other factors – the defendant's "mental and emotional condition").

> ii.   Deportability

Deportation is a significant hardship. *See Padilla v Kentucky*, 559 U.S. 356, 364 (2010) (noting that "deportation is an integral part – indeed, sometimes the most important part – of the penalty that may be imposed on noncitizen defendants who plead guilty to significant crimes."). The Third Circuit has recognized that a defendant's deportability status may be taken into account under Section 3553(a) and warrant a downward variance as a collateral consequence of conviction not taken into account under the Guidelines. *See United States v. Jimenez*, 328 Fed. App'x 802, 804 (3d Cir. 2009); *see also United States v. Thavaraja*, 740 F.3d 253, 262-63 (2d Cir. 2014) ("[A] district court may take into account the uncertainties presented by the prospect of removal proceedings and the impact deportation will have on the defendant and his family."); *United States v. Flores-Olague*, 717 F.3d 526, 535 (7th Cir. 2013) ("A sentencing court is well within its prerogatives and responsibilities in discussing a defendant's status as a deportable alien."). Also, courts have found that a defendant's deportability warrants a downward variance because the need to protect the public from future crimes is diminished under Section 3553(a)(2)(C). *United States v. Morales-Uribe*, 470 F.3d 1282, 1287 (8th Cir. 2006) ("Arguably the need to protect the public from a defendant may be reduced in a case where, upon immediate release from incarceration, the Government will

deport the defendant."); *United States v. Ramirez-Ramirez*, 365 F. Supp. 2d 728, 732-33 (E.D. Va. 2005) ("When a defendant will be removed and sent out of the country, there is less need for the sentence imposed to protect the public from further crimes of the defendant, or to provide the defendant with needed educational or vocational training.").

iii.     Harsh Conditions of Pretrial Confinement

Harsh conditions of pretrial confinement may also serve as a basis for a variance at sentencing. *United States v. Sutton*, 973 F Supp. 488, 493 (D.N.J. 1997), *aff'd* 156 F.3d 1226 (3d Cir. 1998) ("Unusual pretrial confinement … in either length or severity of condition, can properly be considered by the sentencing court."); *United States v. Pacheco*, 67 F. Supp. 2d 495, 498 (E.D. Pa. 1999); *see also United States v. Pressley*, 345 F.3d 1205, 1218 (11th Cir. 2003) ("[C]onditions of confinement could provide a basis for departure, since this factor was apparently not taken into account by the Sentencing Commission and could be unusual enough to take a case out of the heartland of the applicable guideline."); *United States v. Carty*, 264 F.3d 191, 196 (2d Cir. 2001) (same).

In the context of the COVID-19 pandemic, courts in this District have varied below the Guidelines in at least four cases as a result of harsher presentence confinement conditions at the local jails contracted with the U.S. Marshals.  *See* Statement of Reasons, *United States v. Hurt*, Case No. 17-cr-285 (NBF) (Nov. 6, 2020) (granting variance, in part, because defendant "served time during COVID-19 with protocols in place, making it more onerous and also restricted access to

programming"); Statement of Reasons, *United States v. Stevens*, Case No. 18-cr-32 (NBF) (Nov. 5, 2020) (same); Sentencing Hr'g, *United States v. Reddix*, Case No. 19-376 (JFC) (Mar. 18, 2021) (granting variance, in part, because of "horrible conditions with the lock down" because of the "the inability to see loved ones [and] inability to have more frequent phone calls with family," as well as the lack of programming); Sentencing Hr'g, *United States v. Cox*, Case No. 18-cr-50 (DSC) (May 18, 2021) (granting variance, in part, based on the "limitations on [defendant's] liberty that prisoners normally have" in jail).

iv.    <u>Refugee Status and Traumatic Life Events</u>

Lastly, a defendant's "status as a refugee" and "traumatic life history" may also be considered by a court in granting a downward variance from the advisory Guideline range. *Yuot v. United States*, 2011 WL 1542064, at *1 (N.D. Iowa 2011).

## III.   **SECTION 3553(a) FACTORS**

Pursuant to Title 18, United States Code, Section 3553(a), the Court, in determining the sentence to be imposed, must consider (1) the nature and circumstances of the offense and the history and characteristics of the defendant, (2) the need for the sentence imposed, (3) the kinds of sentences available, (4) the kinds of sentences and the sentencing range established under the Guidelines, (5) any pertinent policy statement under the Guidelines, (6) the need to avoid unwarranted sentencing disparities, and (7) the need for restitution. 18 U.S.C. § 3553(a). This section will address the factors relevant to Mustafa's sentencing in this case.

a. **Mustafa's History and Characteristics**

    i.     Childhood Before Syrian Civil War

"We loved to live … We used to play together; we went to school together. My family lived a simple, happy life. When the war started – it was a huge different thing. We never thought something like that would happen."
-Shahid Alowemer (Mustafa's younger sister)

Mustafa was born in Dara'a, Syria on June 5, 1998 to his parents Fatmeh and Mousab Alowemer. He was the first-born child and son to his parents, which has carried with it an added responsibility and expectation within his family throughout his entire life. He has a close relationship with his three younger siblings – Shahid (sister, 22), Hammam (brother, 18) and Y.A. (brother, 13) – who have looked up to him for support during the difficult events his family has been through.

The Alowemer family was relatively poor in pre-war Syria. His mother worked in a clerical role for a local government agency which issued personal identification cards. His father worked in residential construction, where he was able to hire two employees to mix cement. They lived in the 40th District in Dara'a, Syria, also known as Hay al-Arbeen District. Dara'a is an ancient city nestled in the southwest corner of Syria, and is situated in the governate that borders both Israel and Jordan. References to the city of Dara'a can be found in ancient Egyptian hieroglyphics, as well as in the Torah.

Mustafa described a typical day in his pre-teen life: wake up, eat breakfast that his mother prepared, and walk to school with his younger sister Shahid. His

aunt writes about Mustafa, and his reputation as a young student in Dara'a. Letter from Asia Abdul Karim Awaimer (Mustafa's aunt) ("Ex. D" at 1). ("We, his relatives and his family, testify that he was a great helper to the neighbors when they need help, and he is a popular young man among his schoolmates. He was one of the contributors to cleaning and plant the school garden, and who respected and loved the teachers in the school."). Likewise, a close family friend writes that Mustafa was "one of the students who respected his teachers and colleagues the most" and that "[e]ven though he was a small child, he motivated me a lot to work and help my family." Letter from Nora Hassan Fares (Ex. D at 2). After school, he would come home and eat dinner with his family, and then meet friends to play soccer or tag in the streets (the local children named their soccer team after Real Madrid). After playing with his friends, he would come home and do his school work. Evenings were spent with family on the balcony while the adults drank tea. Mustafa was known for his unusual willingness to help his mother with cleaning chores; as the eldest son in the family, household cleaning was typically not something he was expected to do.

Those that knew Mustafa when he lived in Syria universally describe him as a kind and caring boy who looked out for family, friends, and animals. For example, his cousin Rania writes about how much he cared for his grandmother, as well as her brother when he fell ill:

> His grandmother was sick and he was keen to take care of her as she was bedridden. Mustafa used to visit her several times daily, bring her what she needs, prepare her food, give her the medicine she requires constantly, and take her to the garden of the house to entertain herself. Moreover, in an

unforgettable situation, brother Khaldoun fell into a sudden health condition, and Mustafa quickly called an ambulance, escorted us to the hospital, and donated blood to my brother, as he was one of the biggest reasons behind my brother's recovery.

Letter from Rania Muhammad Al-Nuaimi (Ex. D at 3). His childhood friend, Ismael Fares, writes about moving to Dara'a after his father died and how Mustafa looked after him and made sure he was included with the other kids in the neighborhood. Letter from Ismael Fares (Ex. D at 4) ("He used to help me a lot when I used to get bullied at school and when we used to play in the neighborhood because I was not from the same city, he used to always be by my side, and when kids didn't allow me to play with them, he would ask me to play with him."). His uncle Omar, who was Mustafa's mother's youngest brother, spent much time with Mustafa during his childhood and tells the following story: "In the summer of 2003, in a desert area in the town of Nasib, on the Jordan border, we were together on a bike. … We saw a dog that almost died of thirst, in a place where there is no water. I did not dare to approach him for fear because he was fierce. Mustafa ventured to catch him and brought him home to give him water and raised him." Letter from Omar Abdel Karim Al-Awaimer (Ex. D at 6).

We are all shaped – to some extent – by the political and world events that occur during our lifetimes. While most people experience those events in indirect and incidental ways, the Alowemers could not have been more acutely impacted by events outside of their control in 2011. That spring, young students in Dara'a, Syria scrawled graffiti on a wall in their school criticizing the Bashar al-Assad regime. What followed was one of the largest humanitarian disasters ever recorded.

Mustafa's experience during the years that followed would disrupt his tranquil life and change him forever.

ii.    Syrian Civil War and Family Trauma

"Mustafa did not have a childhood because of the war."
-Letter from Abdullah Al-Awaimer (Ex. D at 7)

Details of the Syrian civil war and the damage it wrought on the country and people are set forth in reports submitted with this memorandum. *See* Report by Daniel Masterson, Ph.D. at 3-9 ("Ex. B"); Report by Lucy Guarnera, Ph.D. at 7-9 ("Ex. A"). The brutality of that war and the war crimes committed against the civilian population during the conflict are well documented and common knowledge. Counsel will not write anew everything that befell the Syrian people and the Alowemer family here, but a brief summary is necessary to shed light on the upheaval and trauma experienced by Mustafa and his family. Dr. Masterson briefly addresses the origins and scale of the conflict:

> Some of Syria's earliest pro-reform (and later, anti-government) protests began in Dara'a. ... Despite pro forma public statements about mediation and compromise, the government's response in Dara'a was violence, repression, sieges, and misinformation. The government cast peaceful protests and sit-ins as violent Islamist gatherings and responded with snipers and curfews. Throughout the first few months of protests, sieges, and curfews, Syrian armed forces killed hundreds of civilians, including those at sit-ins and at random in the streets.
> ...
> What began in Syria in 2011 with street demonstrations and calls for political reforms deteriorated into a government crackdown and subsequent civil war. Estimates of the death toll in Syria's war vary but many organizations put the figure well over 500,000, in addition to an even larger number of people wounded and permanently handicapped. Large sections of the country's cities are now in ruins, destroyed by government bombardment. … The civil war led to an enormous refugee crisis. Millions of people have fled to Lebanon, Jordan, Turkey, Iraq, Egypt and beyond. Using UN registration

numbers, which provide a conservative estimate of displacement, four million Syrians have fled to neighboring countries and eight million are displaced inside Syria. In total, this means that more than half of Syria's pre-war population of 23 million people has been displaced by this conflict. This is one of the largest refugee crises in the 20th century both in terms of absolute number and as a share of the country's population.

Masterson Report at 3-5.

Mustafa reported that shortly after the conflict began, Assad forces implemented a lockdown of his community in Dara'a for approximately 2 weeks. PSR ¶ 62. His family could not leave their home and had little to eat. *Id.* During the lockdown, government soldiers would force their way into homes, interrogate and torture civilians, and terrorize people in hopes of rooting out those who opposed Assad. *Id.* This happened on multiple occasions to the Alowemer family. Guarnera Report at 8. Mustafa – who was 12 years old at the time – reports that soldiers came to his family's home, put a gun to his head, threatened his life, and permanently maimed his father, shattering his leg. *Id.* Mustafa's father describes the incident, and the aftermath, as follows:

> At that time, I was injured due to a hit by a Syrian soldier in my leg that made life very hard for me and my family back there. Because of that injury, I did not have a choice but watching my wife and 13 years old son work to make life easier for all of us. Mustafa was a child when held a huge responsibility because he saw me suffering from my injury. I could not work for so many years after my injury and Mustafa had to keep on carrying on that huge responsibility and taking care of the family after his mom stopped working in Jordan.

Letter from Mousab Alowemer (Ex. D at 8). Mustafa's sister, Shahid, described another raid where the family was forced to line up against the wall while soldiers ransacked the home. Guarnera Report at 8 ("She explained that they believed themselves to be moments from death, as soldiers typically made victims face the

14

wall before shooting them in the back."). Mustafa and his family report how they braved the constant fear of gunfire, explosions, and strikes from above while locked in their home. *Id.* ("His sister, in a school essay, recounted staying awake at night and listening to the bombs falling around them, counting the seconds between each bombs' release and impact ('I covered my head in the blanket, waiting for either my death or the sound of the shell somewhere else').")." Mustafa reports that the military would intentionally contaminate the water supply in their neighborhood by placing dead animal carcasses in the water tanks. *Id.*

After the lockdown ended, Mustafa discovered that his entire world had been destroyed and turned into a warzone. The army converted his school into a military station. There were "[d]ead bodies everywhere." *Id.* Mustafa described the extent of the carnage: "There is literally nothing that we did not see there…. You would see stuff that you never dreamed of seeing, even in your [worst] dreams." *Id.* Soldiers occupying the city would "humiliate, threaten, assault, rape, shoot, and behead" adults and children alike with impunity. *Id.* As his mother explained, Mustafa was in particular danger because soldiers assumed young males like him were part of the perceived revolution. *Id.* ("Parents were locking down and completely quarantining their kids inside their homes, because of fear of the army coming and pulling these kids out and torturing them. We feared for our kids' lives…. So many kids went missing.").

Despite the danger to Mustafa, as the eldest son and with his father nursing his debilitating injury, he went to work to support his family. His mother writes to explain the burden Mustafa took upon himself at the outset of the war:

> At the beginning of the war, when he was twelve years old, he always helped deliver food, bread, vegetables, and medicine to neighbors and families in need. He always helped me bring vegetables and fruits when his father was injured at the beginning of the war. I remember at the beginning of the war when the schools were closed, life became very difficult and there was no source of livelihood at all. I used to go to work in the fields and gather vegetables despite the dangers of bullets and planes. He used to help me. … He would bring food to the family every day and at some point, he asked me not to go work in the fields anymore. He asked me to just stay at home to take care of his father, his grandmother, and siblings. He told me that he would go to work and bring money, and he would. When there was no work, he would go to collect mushrooms from the plains and sell them to people, and he would never come home empty-handed. He was an example of a good son.

Letter from Fatima Abdul Karim Al-Awaimer (Mustafa's mother) (Ex. D at 10). Mustafa – still 12 or 13 years old – recalls riding the bus to the fields thinking, "I am a man now. I have to take care of my family." Guarnera Report at 9. In the fields, his life was no less in danger, as Assad's soldiers would shoot at farm workers thinking they were rebels looking for food. *Id.* On one occasion, he ventured too far into a bean field and found 10 corpses piled on top of one another. *Id.*

Letters from his close family demonstrate that as an early teen he shouldered the burden while selflessly keeping his own strife to himself. Letter from Shahid Alowemer (Ex. D at 12) ("Your Honor, Mustafa suffered a lot and went through hard times, but he never showed it to anyone."); Letter from Fatima Abdul Karim Al-Awaimer (Ex. D at 11) ("He did not show this struggle in front of us, for the sake of the family's happiness and for fear of his injured father's feelings. … He always told

me, 'what's to come, is more beautiful, God willing.'"). Perhaps he believed that was the strong presence his family needed during the early days of the war, but it undoubtedly put a pressure on Mustafa that – over time – he was unable to bear.

      iii.      <u>Refugee Camps and Life in Jordan</u>

> "After that, everyone's life changed for the worse after we became refugees. Most of the children were deprived of schools, and Mustafa was one of them. He was deprived of his childhood and his studies. He did not go to school, because he had to help his father, he worked and helped his mother as well."
> -Letter from Mahmoud Fares (Ex. D at 14)

After moving from their home in Dara'a to Mustafa's uncle's home in Jaleen (in the outskirts of Dara'a), the fighting resumed and, in 2013, the Alowemers made the decision to flee their homeland for Jordan. Mustafa was 14 years old. During his pretrial interview, Mustafa explained the multi-step journey that his family took to reach the border. First they took a taxi, then they were loaded on a truck, and then they were forced to run the final several hundred yards to reach the safety of the Jordanian side of the border. PSR ¶ 63. By becoming refugees in Jordan, however, the Alowemers traded the danger from Assad's forces with the danger of discrimination and maltreatment by the Jordanian authorities. It was a trade the Alowemers were willing to make, but it did not come without grave costs.

In connection with this sentencing memorandum, Dr. Masterson authored a report on the Syrian refugee crisis with specific focus on the common experiences among Syrians living in Jordan after fleeing their country. Counsel will highlight some relevant points made in Dr. Masterson's report here:

- "Syrians settled in Azraq and Za'atari camps were subject to severe restrictions on their movement. … They were only allowed to permanently move out of the camps with a Jordanian sponsor, a process evocatively referred to as 'bailing out' a Syrian." Masterson Report at 12.

- "Syrians in Jordan face widespread economic hardship, poverty is prevalent both inside and outside of the refugee camps. … Syrians generally faced higher prices and higher rent outside of camps and received fewer services from humanitarian organizations outside of camps." *Id.* at 14.

- With respect to substandard housing outside the camps, many "mentioned asthma and other chest ailments from moldy rooms with high humidity, water-borne diseases and skin rashes from polluted river water, mosquito-borne diseases, insect bites, and bone diseases due to a lack of sunlight in living quarters." *Id.* at 15.

- Schooling for Syrian children in Jordan was met with multiple obstacles: (1) discrimination against Syrian children by school administrators was rampant, (2) bullying by other students, (3) the opportunity cost of putting child in school versus working to support family, (4) high cost of tuition, and (5) high cost of transportation to school. *Id.* at 16-17.

- "Another major challenge that Syrians report is fear of being detained by authorities for improper documentation. Traveling even short distances may involve passing through checkpoints or being confronted by police in another way." *Id.* at 19.

The Alowemers experienced much of what is reported by Dr. Masterson. Upon their arrival in Jordan, the Alowemers were placed in the Za'atari refugee camp. It was dangerous there as it was overrun with wild dogs and, occasionally Jordanians – angry about the immigration crisis at their border – would spray gunfire into the camps. Every day, Mustafa walked long distances to obtain water and what small daily rations were provided to the refugee population. His aunt, Najah Aqla Al -Awaimer, writes about how Mustafa distinguished himself at the

Za'atari refugee camp. Letter from Najah Aqla Al -Awaimer (Mustafa's aunt) (Ex. D at 15) ("In the camp, he was carrying gas cylinders in a cart and delivered them to them in front of the caravans. Also, in the Zaatari camp, … [h]e used to carry water in a bucket and deliver it to its owners …."). Within a matter of weeks (or perhaps a couple months), the family reconnected with family in Jordan and were able to move out of the camp.

Life outside the camp was marginally better, but not by much. With his father still unable to work, his parents decided to keep Mustafa out of school so he could work to support the family. His uncle writes, "Mustafa was the main caregiver to his family. He takes care of his younger siblings, mother, and his fathers even though he was young, he was capable of the responsibility that has been placed upon him." Letter from Abdullah Al-Awaimer (Mustafa's uncle) (Ex. D at 7). At age 14, however, and with no valid work permit, Mustafa's foray into the local work environment was treacherous.

His sister writes about a serious work injury he sustained performing manual labor: "He suffered a lot with his small body in Jordan when he used to work very hard to help my day," citing to an instance when he injured his back so badly lifting a heavy item that he was not "able to control his tears." Letter from Shahid Alowemer (Ex. D at 12). He and his family reported the following to Dr. Lucy Guarnera during her interviews:

> He reportedly worked in a variety of factory and manual labor jobs from ages 14 to 19, although he and his family spoke most of his difficult experiences in a leather factory. He recounted working with dangerous machines that "could easily chop your hand off," and being sent to desolate areas to clean hides

19

from animal carcasses, where the scent of blood attracted hyenas. He reflected, "It was terrible cleaning the animal skins: blood everywhere, stinks, get blood in your mouth. It was all about just getting used to it." His mother recounted how she forced him to remove his clothing outside before permitting him to enter the house at the end of a shift because she found the stench so revolting, even though it "broke" her emotionally to treat her son in this manner while he was suffering to support the family. His mother and sister also recounted that the harsh chemicals Mr. Alowemer used to clean the animal hides shriveled his skin and caused his fingernails to fall off, although he "never said a word, never complained," as his mother put it.

Guarnera Report at 10. Consistent with Dr. Masterson's report to the Court, in addition to the dangerous and substandard work conditions, Mustafa was subjected to harassment by local officials for working without a permit. He was arrested several times by local Jordanian authorities for working. During one of those arrests, Mustafa recalls being tortured by being strapped to a bedframe, kicked repeatedly by guards, threatened with guns, forced to urinate and defecate on himself, and fed inedible food. *Id.*[1] That incident almost resulted in his deportation, but fortunately a family member was able to intervene and prevent that from happening. *See id.*

In Jordan, Mustafa's family first noticed his posttraumatic symptoms from all that he witnessed and endured. He reported to Dr. Guarnera that while he felt "numb" under "constant threat" in Syria, in Jordan he began having flashbacks, mood changes, sleep disturbance, and would avoid activities that reminded him of the atrocities he witnessed. *Id.* His mother and sister described his demeanor as

---

[1] It is worth noting that on June 19, 2019, upon his arrest in this case, Mustafa was transported to FBI offices on the southside of Pittsburgh. While in transit to the FBI's offices, Mustafa asked FBI agents if they were going to kill him.

"sad, quiet, detached, isolated, and withdrawn." *Id.* at 10-11. Despite Mustafa

keeping his struggles to himself, his mother knew he was suffering because "[h]e

was not living the same life as Jordanian kids or even refugees whose parents could

work." *Id.* at 11. The stories told by Mustafa and his family certainly capture the

heavy burden he bore and the horrid work conditions he endured. But it must be

understood that he lived under these circumstances for *over four years*, from ages 14

to 19. The effect that would have on Mustafa – during the most important years of

his development – cannot be overstated.

        iv.      <u>Asylum and Resettlement in Pittsburgh</u>

> "Since his childhood, the kids have loved the United States and
> watched American movies and series. When we came here, he was the
> happiest person in my family because he was accepted into the school
> and returned to the education system, and started studying."
> -Letter from Fatima Abdul Karim Al-Awaimer (Mustafa's mother) (Ex.
> D at 10)

While in Jordan, the Alowemers applied for asylum to the United States.

Their application was granted and, on August 1, 2016, they arrived in the United

States. Mustafa had just turned 19 years old. Mustafa describes staring out the

window for hours on end, amazed that "everything is green, there's no sand."

Guarnera Report at 11. He was elated: "Literally, I thought it was heaven, I

thought it was the best place ever. … I couldn't believe it. … It was like the best

days of my life. … Land of the free!" *Id.* His family was resettled in the Northview

Heights neighborhood of Pittsburgh.

The Alowemer and Fares family were neighbors in Dara'a and lived close to

each other in Jordan after fleeing the country. Both families were granted

permission to seek asylum in the United States. Mahmoud Fares writes about

learning they would be able to leave Jordan:

> Many families received calls to travel outside Jordan and my family as well
> as Mustafa's family were among the lucky ones. Mustafa's family never
> hesitated to travel, and they were very happy. In Jordan, Mustafa's family
> was tired and suffered a lot, so they were among the happiest people to leave
> for the United States. Mustafa was very happy that they will have many
> opportunities there, and one of the most important of these opportunities is to
> study and live in safety.

Letter from Mahmoud Fares (Ex. D at 14). Letter after letter submitted with this

memorandum recount the pure joy that Mustafa felt coming to the United States.

Letter from Ibrahim bin Abdul Karim Al-Awaimer (Mustafa's uncle) (Ex. D at 16)

("Mustafa jumped from joy to travel to the United States for a better life and to

complete his studies, which he lost in Syria and Jordan."); *see also* Letter from

Najwa Al-Masry (Alowemer family neighbor in Jordan) (Ex. D at 17); Letter from

Ahmed Mohammed (former classmate) (Ex. D at 18); Letter from Nasreen Khalil Al-

Loubani (Alowemer family neighbor in Jordan) (Ex. D at 19).

Mustafa immersed himself in his studies and relished the opportunity to

further his education. Mahmoud Fares writes about how much Mustafa enjoyed

school here in Pittsburgh. "[H]e told me that he is very happy and he studies hard.

He told me that he has many friends in school and that he loves culture. He told me

that his school is interested in showing cultures to all the different students in his

school. That they show different cultures and hold celebrations every year."  Letter

from Mahmoud Fares (Ex. D at 14). His sister recalls how they took an English

class at Carlow University together in the summer of 2018, and how she helped him

apply to CCAC and for financial aid: "he was very happy that I will never forget the smile on[] his face." Letter from Shahid Alowemer (Ex. D at 12).

Mustafa did well in school and became a leader amongst his peers. Anne Meade, one of his teachers from 2017 to 2019 at Brashear High School, writes that Mustafa worked hard during and after school hours to graduate high school before he aged out. Letter from Anne Meade (Mustafa's teacher) (Ex. D at 20). She also credits Mustafa for helping his fellow ESL students to ensure they were able to graduate as well. *Id.* ("Without Mustafa's help, there are three of his former classmates that would not have graduated. He assisted them daily in English class."). Likewise, Asiya Uwimana, a fellow student at Brashear, writes of an incident where Mustafa stood up for a Nepali student struggling with an assignment:

> Mustafa was the kind of person that protected the other girls and stood up for what was right. I remember one time in one of the classes, the other students were making fun of one of the Nepali students who did not understand the assignment and was answering incorrectly. Every time the student read the answers, they would laugh at her. ... Mustafa told them to stop and reminded them that they were also in her shoes once. I really admired that because despite everyone else in the class finding the situation funny and laughing at the girl, Mustafa saw that it was wrong and stood up for her. I am also glad that ever since that incident, I did not witness any of the student's making fun of another in class.

Letter from Asiya Uwimana (Ex. D at 22).





He completed high school in three years, using the final year to finish both 11th and 12th grades.  He received multiple certificates for his academic achievements, including four honor role certificates, three language awards, a student of the month recognition, a Carlow University certificate for completing a high school/college immersion program, and multiple certificates from an sp2 automotive program. *See* Compilation of Certificates ("Ex. E"). At age 21, Mustafa graduated high school in May 2019. He applied for and was accepted to attend school at CCAC. *See* CCAC Acceptance Letter ("Ex. F").



In many ways, Mustafa was able to live a semi-normal teenage lifestyle. "He made many friendships quickly with other young boys and girls his age. He always

participated in the celebrations that were held in school and outside school. He went to many of his friends' birthdays, and he brought in many gifts to his school friends. He liked to go on trips with his friends inside and outside the school. He loved everyone and everyone loved him back. He was very interested in his studies. He completed his high school intensively in three years and graduated with honors because he was very interested in his studies." Letter from Fatima Abdul Karim Al-Awaimer (Mustafa's mother) (Ex. D at 10).

Despite his responsibilities to his family, and his school schedule, Mustafa still felt compelled to help others in his situation. His friend Faisal writes about the charitable works Mustafa performed before his arrest. Letter from Faisal Adeeb Al-Awama (Ex. D at 24) ("Mustafa and I worked to assist the Al-Ansar Association to help refugees from the affected countries. We worked together late at night, even though we were attending school. Mustafa was also helping the neighbors to drop off and take their children to school in his own car because we were in the same school."). Dr. Wiam Younes, Executive Director of ANSAR of Pittsburgh – which helps Syrian-refugee families who were resettled in Pittsburgh – writes about a trip she organizes for children in the Pittsburgh-Syrian community.

> In 2018, I took a group of Syrian refugee youth on a trip to Ohio Pile [sic] for water rafting. Mustafa and his sister joined us. For the first time, I saw him as a young man having the thrill of his life. The responsibilities he carried heavily on his shoulder dissolved for two hours. He was extremely appreciative to experiencing such fun without feeling guilty about not working. Refugee children are handed responsibilities way above their age. They are guardians of their parents, without the right to make decisions, because they learn English much quicker than their parents and assimilate faster in the society.

26

Letter from Dr. Wiam Younes (Ex. D at 25.)



By most accounts, Mustafa was thriving. He was successful in high school and was accepted to attend community college. He was socializing well and had close friends. He was active in extracurricular activities and volunteered with organizations like ANSAR. He was an eldest son and brother in a family that had endured so many struggles – for years – but which had the good fortune to come to a country that protected them from many of the dangers and horrid conditions that had become commonplace. The successful life he had imagined before the war was back on the right trajectory. But beneath all the hallmarks for success was a young man who struggled mightily to cope with the trauma he endured, and the guilt he experienced of having left behind so many who did not survive. Through social

media, he was bombarded with news of Syria and his friends and family that were

not so fortunate. It was a burden that was too great to bear.

> v.  <u>Retriggered Trauma</u>

> "He explained that he had grown up in Syria during the war. He told
> stories of loss and life during the war. He expressed a sense of
> hopelessness. He grappled with the point of high school. Mustafa
> expressed a desire to go back to his country to help fight the war. … He
> explained that he wanted to go back to help his people. He explained
> how it was unfair that he was safe in the US and his friends and
> family were dying in Syria."
> -Kaitlin Hensgreco, notes from nurse's office, February 12, 2019 ("Ex.
> H")

As detailed above, upon learning they were coming to the United States, the

Alowemers – including Mustafa – were overjoyed. It provided an escape from the

hell they endured for seven long years. It was the promise of a new life. But despite

the reprieve from the war in Syria and the daily humiliation of living as a refugee in

Jordan, the life they left behind in their homeland cast a long shadow. Mustafa's

past could not be unwritten. Whatever opportunities awaited him in this country,

he was still the person who had experienced the displacement of war, endured the

threats and torture and harassment for years, and who witnessed unspeakable

atrocities. And although he left that world behind, it all still weighed heavily on

Mustafa.

On August 1, 2016, the Alowemer family arrived in the United States. On

August 30, 2016, Mustafa was evaluated at Squirrel Hill Health Center in

connection with his initial refugee assessment. Although the physician assistant

who evaluated him noted he "appears in good health," the records reflect that

Mustafa reported "[f]eeling down, depressed or hopeless (several days)." Squirrel Hill Health Center Record (Aug. 30, 2016) ("Ex. G"). Not one month into the new life and promise offered by his grant of asylum, contemporaneous records demonstrate the persistent damage Mustafa carried with him to Pittsburgh.

The Alowemer family was settled in the Northview Heights neighborhood in Pittsburgh. Both Mustafa and his sister report they witnessed frequent crime and gun violence there. Guarnera Report at 11.



At home, his father continued to suffer from his leg injury and heart condition wrought by the war. That continued to hamper his ability to work, which required Mustafa to also maintain employment at a local restaurant while going to school. His mother experienced emotional episodes that – on at least one occasion – resulted in her fainting and breaking her nose. Letter from Fatima Abdul Karim Al-Awaimer (Mustafa's mother) (Ex. D at 11). Luckily – and not surprisingly – Mustafa was there to help. *Id.* ("I can not forget that day, October 16, 2018, when I fell and fainted in my house that day, I did not realize what happened to me, and after I

regained consciousness, I screamed and the first person who saw me was Mustafa, who was crying and called the ambulance, and stayed with me in the hospital. That day, I broke my nose, and was crying when he saw me, and he was wiping the blood off my face and telling me: Don't be afraid, mom, you're fine. He took care of me until I got better. He did all the housework until my health improved."). Mustafa also reported the continued stress of having to liaise with the refugee center, complete paperwork, and drive members of his family around the city for their appointments as needed. Guarnera Report at 11.

At school, Mustafa felt alienated from the broader student body because of his background and language barrier. Many students kept their distance from him, and others actively bullied him. He recounts instances where students would call him "terrorist" or "Osama bin Laden" simply because of his race and religion. *Id.* at 12. The school principal – Kimberly Safran – noted that whereas Mustafa's sister was far more outgoing and willing to tell her story as a refugee, he was more reserved and guarded, which made it more difficult for school administrators to perceive a need for intervention. *Id.* at 11. Katie Daley – Mustafa's English teacher for the first two years he attended Brashear – enjoyed a close relationship with Mustafa, even having dinner at the Alowemer's home. On occasion, Mustafa would open up to her about what he had endured and would even show her images of his family home in Syria after it was reduced to rubble. Ms. Daley also observed Mustafa's reliance on his cell phone, often consuming news media of the Syrian civil war, and social media communications about the well-being of family members. In

30

one instance, she recalls Mustafa needing his phone to learn how his uncle and cousin were doing; after reviewing his social media he learned they had been killed and he showed her their bloodied bodies. *Id.* at 12. She noted he was very sad that day. Christine Tapu – Mustafa's ESL teacher throughout his time at Brashear – observed what she perceived as Mustafa's survivor's guilt, noting times when he would ask "why he made it to the U.S." and "what he is doing here" when "people are dying all the time." *Id.*

During Dr. Guarnera's evaluation of Mustafa, he explained that he began accessing ISIS-associated social media because the people depicted on those sites "appeared to care deeply about helping Syrians …." For example, much of what he viewed online "depicted ISIS as a volunteer force helping suffering Syrians (e.g., providing food or medical care to civilians)." Guarnera Report at 14. Feeling separated from everything he knew – literally and culturally – and experiencing the hopelessness and guilt of having survived the conflict, "he began to believe that he should also return to Syria to help his country." *Id.*

His family observed Mustafa go through waves of depression. Mustafa's moods appeared to fluctuate with news he would receive about family and friends that were killed or harmed back in Syria. His sister explained, "[e]veryone who was close to Mustafa is not here no more. … People his age were killed in a horrible way." *Id.* at 12. His sister and mother recall multiple instances where he would tend to withdraw from the family, lock himself in his room, and not speak to anyone for days. *Id.* He would lay in his bed and obsessively consume news about the war,

31

social media with friends and family, and other outlets. *Id.* During these episodes he would lose weight from lack of eating. *Id.* His sister noted that these mood swings would increase in frequency, until they would happen once or twice a month. *Id.*

Dr. Guarnera writes about Mustafa's lack of mental health treatment and the likely reasons he did not seek such services. First, the Alowemers saw depression and anxiety as normal responses to what they suffered through, so they did not see it as a condition to be treated. As Shahid Alowemer told Dr. Guarnera, "[w]e honestly did not know what 'depression' and 'anxiety' were" before coming to the United States since virtually all Syrian refugees in Jordan experienced it to a certain degree. Second, addressing the trauma they experienced would only exacerbate the feelings they were desperately trying to avoid. As Mustafa's father explained: "We try not to think of those memories .... There is no use to think back about Syria and Jordan. … We just dwell on the good parts and pass over the bitter parts." *Id.* at 12-13. And third, the family's own collective trauma resulted in their failure to properly address Mustafa's personal issues. Both his mother and father report that they were struggling so much with their own feelings and avoidance thereof, they lacked the capacity to help him when he was struggling more than usual. *Id.* at 13. Characteristically, Mustafa did not want to upset his parents more than necessary, and would keep his feelings inside rather than force them to confront their issues too. *Id.* This is not an uncommon dynamic in refugee families. *Id.* at 14 nn. 17-19.

At school, Mustafa's mood swings came to a crescendo on February 12, 2019. That morning, Mustafa had learned that friends and cousins had died in Syria. A teacher overheard him express a desire to kill himself. He was immediately brought to the nurse's office, where he complained of a stomachache, backache, headache, and being shaky. Daily Visit Report, Brashear High School (entry dated Feb. 12, 2019) ("Ex. H" at 1). There, he met with Kaitlin Hensgreco, a social worker at Brashear. She wrote the following in her report:

> I was called to Nurse Lane's office to support. Mustafa was brought to the nurses office because had expressed suicidal thoughts. Nurse Lane had been speaking with Mustafa. I met with him in the back of the nurses office. While Nurse Lane called Resolve, I asked if he had a plan to kill himself today, he said he was having thoughts but no specific plan. I asked if he had plans hurt someone else, he said no.
>
> Mustafa and I had a conversation about his life. He explained that he had grown up in Syria during the war. He told stories of loss and life during the war. He expressed a sense of hopelessness. He grappled with the point of high school. Mustafa expressed a desire to go back to his country to help fight the war. He explained that his parents were not supportive of him going back to Syria. He explained that he wanted to go back to help his people. He explained how it was unfair that he was safe in the US and his friends and family were dying in Syria.

Student Notes, Brashear High School (entry dated Feb. 12, 2019 at 10:26 a.m.) (Ex. H at 2). Mustafa explained further to Dr. Guarnera: "I was so depressed, to the point that I felt like, 'I'm out, I'm done with this.' … I wanted a teacher to help me, but at the same time, I felt like I'm empty from the inside. I'm broken. … I felt destroyed, literally." Guarnera Report at 15.

Thereafter, Mustafa drove home, and his family advised a Resolve employee that no mental health services were needed. As will be discussed in further detail

below, the FBI online covert employee made the first contact with Mustafa on March, 8, 2019, less than one month later.[2]

### vi. Acceptance of Responsibility and Remorse

"In my heart, I know it's wrong. It is horrible"
-Mustafa Alowemer at FBI Offices referring to his offense

On September 16, 2021, Mustafa pled guilty to Count One of the indictment. Consistent with his guilty plea, Mustafa admitted to his offense and accepted responsibility for both the harms that he caused and the punishment that is yet to come.

Mustafa's guilty plea and acceptance of responsibility is consistent with his actions on the day of his arrest. That day, immediately after being arrested by FBI agents, Mustafa was taken to FBI offices in the southside of Pittsburgh. There, he immediately signed a *Miranda* waiver, he detailed his offense to law enforcement agents, and described what he did as "horrible." On the day of his arrest, Mustafa told agents that, "in my heart, I know it's wrong."

Those that know Mustafa best have spoken to him since his arrest and attest to his genuine remorse for his actions. Mustafa's father writes of his son's remorse. Letter from Mousab Alowemer (Ex D. at 9) ("He talk to me every day, and he always tell me that he is very deeply sorry for what he did and want a change to go back to his normal life, study and work to help our family become happy again."). Likewise, several of Mustafa's close friends write to convey Mustafa's remorse in the wake of

---

[2] A summary of the offense conduct will follow in a later section. *See infra*, Section III.B.

his arrest. Letter from Faisal Adeeb Al-Awamah (classmate/neighbor in Pittsburgh) (Ex. D. at 24) ("I spoke with Mustafa several times on the phone while he was in prison, and he was telling me how much he regretted what he had done. He has changed a lot for the better."); Letter from Alla Al-Awamah (high school friend) (Ex. D at 27) ("I spoke with Mustafa several times over the phone, and he told me that he regretted what he did.");  Letter from Alaa Fares (lifelong friend) (Ex. D at 28) ("After the incident, I spoke with Mustafa over the phone, and he always expressed his great remorse. … He always tells me how the incident affected his life and his family, and he regrets what he did."); Letter from Mahmoud Fares (Ex. D at 14) ("I talk to Mustafa from time to time while he is in prison, he has changed and has become mature and aware of the mistake he committed."); Letter from Ismael Fares (Ex. D at 5) ("Your Honor, what Mustafa did is wrong, and he acknowledge that, he told me that he was wrong and he is really hoping to come back to his family and life. He is working hard inside the jail and helping many people there, because he really wants to become a better person.").

vii.   Experience in Custody and Rehabilitation

> "Being in jail for as long as I have, it is difficult to feel normal. Learning and growing as a person helps. I thank Mustafa for the time and attention he spent helping me feel normal, especially during covid when no services were available to help us grow."
> -Terrence Anthony Zeppenfeldt (prisoner at ACJ) (Ex. D at 30)

Mustafa has been in custody since his arrest on June 19, 2019. During that time he was housed in Mahoning County Prison (from June 2019 to March 2021), in Allegheny County Jail ("ACJ") (from March 2021 to September 2022), and NEOCC

in Youngstown (from September 2022 to present). Mustafa began his experience in the local jails in this country weeks after his 21st birthday. He did so as a foreign-born, non-English speaking, Muslim man charged with a terrorism offense. He did so during the entire COVID-19 pandemic, experiencing COVID-19 symptoms at Mahoning County Prison but the jail failed to test him, and contracting the virus a second time after testing positive at ACJ on August 14, 2021. Despite the unusually harsh conditions of pretrial confinement due to his background/native language/charges, as well as the pandemic, Mustafa did his best to grow and take positive steps toward his rehabilitation.

A fellow prisoner housed with Mustafa describes him as a young man that was respected by both jail staff and prisoners alike. *See* Letter from Terrence Anthony Zeppenfeldt (Ex. D at 29-30). At ACJ, having established himself as someone who had a "great work ethic and was always reliable," Mustafa was elevated to the position of a pod-worker. His responsibilities included passing out food trays, cleaning the pod, and working closely with the correctional officers to make "daily operations smooth." Because of his reputation, and after COVID-19 restricted gradually abated, the jail permitted Mustafa to teach Arabic classes to his fellow prisoners. Approximately 15 men met with Mustafa twice a week learning Arabic numbers, letters, and basic vocabulary. *Id.* Mr. Zeppenfeldt credits Mustafa with "drastically" changing the "level of normalcy" in the pod. He also observed how Mustafa changed and matured while in custody, explaining how "[f]rom learning to speak better English to managing his emotions productively and positively,"

"Mustafa grew a lot as a man." Mustafa also was known for his generosity (giving fellow prisoners his last envelope or food) and for his levelheadedness (breaking up fights as a "well-respected" voice of reason). The defense team communicated with jail staff and confirmed Mustafa's role as a pod-worker and the class he taught.

Being in custody during the COVID-19 pandemic was especially difficult because access to outside services was severely limited, if not completely cut off. For someone in Mustafa's position, with well-documented instances of trauma and difficulty coping with those experiences, he was forced to endure incarceration without the help that he sorely needed. Defense counsel can relate instances where Mustafa was forced to relive wartime bombing when fireworks were set off in the downtown area. In one instance, ACJ records provide a snapshot to the intense disorientation caused by his PTSD:

> Responding to SCR MH sick call. Inmate has difficulty speaking and understanding English. He asks about mental health counseling that doesn't involve taking medication. Writer inquires what he wants help with and inmate replies by describing acute trauma sxs, such as flackbacks [sic], intrusive thoughts, nightmares, hypervigilance, related to his war experiences in Syria. Writer asks why is doesn't want medications and he states, "I'm not better than them," referring to his friends and family in Syria who don't have access to medication. Writer attempts to explain the difficulty of trauma tx in an environment like ACJ. Inmate believes he will be deported to Syria, where he will be killed, and won't have an opportunity to seek tx in the community. … [T]he language barrier makes conversation difficult. Another challenge is that inmate reports that most of his friends have been killed and he appears to suffer from survivor's guilt. Writer speaks with him about coping strategies for sxs of PTSD.

ACJ Sick Call Report (June 10, 2021) ("Ex. I"). Records collected by the defense team make clear that, while incarcerated, Mustafa struggled to cope with his PTSD without any meaningful treatment while enduring life in a custodial setting during

the deadly COVID-19 pandemic. Despite this, he worked hard to better himself and be a force of positivity in a place where that can be hard to find.

### b. Nature and Circumstances of the Offense

The Probation Office summarized the offense conduct in paragraphs 13 through 26 of the PSR. Mustafa acknowledges his wrongdoing and understands the seriousness of his offenses. Consistent with his admission on the day of his arrest and his guilty plea on September 16, 2021, Mustafa accepts responsibility for his conduct.

Mustafa does not make excuses for his conduct in this case. That said, undersigned counsel believe it is important to detail the specific circumstances that led up to Mustafa's initial contact with the Online Covert Employee ("OCE"), and the manner in which he became entangled in the FBI's investigation. This context is essential to understanding the nature and circumstances of the offense, rather than relying on key snippets of dialogue that fail to capture how Mustafa interacted with the undercover FBI agents in the investigation.

As detailed above, following Mustafa's arrival in the United States after years of torment as a victim and refugee of the Syrian civil war, he suffered from bouts of depression resulting from his PTSD. His family observed intermittent withdrawal from social life. His teachers observed him – on occasion – struggle with news from Syria as he learned that family and friends were killed in the conflict. That news, which streamed in endlessly on his phone, drew Mustafa into the oft-dangerous world of online communities committed to sowing discord and violence.

38

Dr. Stevan Weine – a licensed physician in the State of Illinois and Professor of Psychiatry at the University of Illinois at Chicago – submitted a report in connection with this sentencing memorandum detailing the extraordinarily effective ways extremist groups, like ISIS, prepare traumatized young Muslim males to make poorly informed and reckless decisions. *See* Report by Dr. Stevan Weine ("Ex. C"). Mustafa's difficulties coping with his prolonged wartime PTSD culminated in an incident on February 12, 2019 when he learned of the death of family members and friends through his social media account. He expressed suicidal thoughts, he was taken to the school nurse's office, and he was seen by a social worker. He told her that he was feeling hopeless and guilty for having survived when so many young people like him were dying in Syria every day. Mustafa was sent home, but he returned to school in the following days. As it so happens, FBI agents made their first contact with Mustafa by befriending him on Facebook on March 8, 2019, three-and-a-half weeks later.

After observing Mustafa's online behavior in 2018, an online covert employee ("OCE") befriended Mustafa on Facebook. For approximately 5 weeks, the two spoke about their lives, their disgust of Shi'a Islam and other religious groups, Mustafa's desire to travel back to Syria, and their support of ISIS. During those nearly daily communications, on no less than three occasions, the OCE requested/suggested that Mustafa make a Bay'aa video (a pledge of allegiance to ISIS), which was portrayed

as a condition precedent to further involvement with the "brothers."[3] Ultimately, on April 12, 2019, Mustafa sent the OCE a Bay'aa video and, two hours later, the OCE sent him the contact information for a local "brother" who will provide him with a secure cell phone. On April 16, 2019, Mustafa met with an undercover employee ("UCE") in North Park.

Mustafa met with the UCE on five occasions: April 16, April 25, June 2, June 11, and June 19, 2019. As is the case with the OCE, conversations between the UCE and Mustafa revolved around religious grievances against "apostates" (Shi'ite Muslims) and "nonbelievers" (other religions). In these conversations, the UCE often complimented Mustafa on the strength of his religious faith, his Arabic language proficiency, and his perceptiveness to gather information for a potential target. Throughout his meetings with the UCE and the CHS, Mustafa repeatedly emphasized his ignorance about this kind of activity absent help from the agents: "If you were not here, we wouldn't be do[ing] anything. [4] On another occasion he said "I don't know that much about creating bombs and stuff like this, so I'm just trying to learn.[5] But the agents underscored Mustafa's information gathering abilities: "you were looking for all the right things, all the proper things."[6]

---

[3] Mustafa later told the UCE that he did not want to make the Bay'aa video, but ultimately decided to because the opportunity to travel to Syria aroe when he was contacted by the OCE. GOVT_19219_00498.

[4] GOVT_19219_00515.

[5] GOVT_19219_00493.

[6] GOVT_19219_00466.

In their first meeting on April 16, 2019 the UCE and another undercover FBI agent (a Confidential Human Source "CHS") met with Mustafa. The agents emphasized the need to take action and not just discuss. Per the UCE, if anyone was not serious "then that Moslem needs to leave" and "there is no point for anyone to be at this table."[7] In response, Mustafa bragged that while was in Syria he destroyed a Minaret because it had an "unbeliever" Christian in it.[8] From there, the agents quickly turned the conversation to the subject of each person's "roles" in the group. The UCE said he had an engineering background and was an expert at making explosives or "cooking." Per the UCE, he was a "lion in the kitchen." The UCE and CHS encouraged Mustafa's role to that of gathering information about a possible target: "we rely upon you (Mustafa) getting the information so we know it is a good target or a bad target."

On April 25, 2019, the agents and Mustafa met for a second time. Mustafa had canvassed a mosque with Shi'ite worshippers as a possible target but decided against it because Sunni's might be harmed. In the time between the meetings, the UCE and Mustafa frequently communicated via peer-to-peer communications such as Telegram. The two discussed their faith and what it meant to be a good Muslim. The UCE often asked Mustafa to help him with his Arabic. UCE tells Mustafa that God put him in the "disbeliever's domain" in order to "execute [a] plan with Mustafa." GOVT_19219_00641.

---

[7] GOVT_19219_00434.

[8] GOVT_19219_00436. There is no evidence that Mustafa's claim about destroying a Minaret is anything but a tall tale.

41

By the third meeting, on June 2, 2019, Mustafa mentioned the Legacy International Worship Center as a target and that the church is attended by Nigerians.[9] Mustafa also mentioned that the explosive should be set just after midnight, around 3:00 a.m.[10] The UCE asked Mustafa if he wanted to harm the "polytheist Christians" in the church or if he just wanted to burn the building.[11] Mustafa replied he does not know and will have to think about it. The UCE also mentioned that some people who are inside the church or in a nearby building might die from an incendiary device that causes fire. Mustafa said he did not believe that people resided in the houses next to the church.[12]

This led to the following exchange about why Mustafa selected the Legacy International Worship Center as the target. Thus far, the government has only partially quoted this exchange in their filings. A full reproduction is below.

MA:     *And the – uh, this house is still for the ones who go to church because they are Nigerians. [UI]*
UCE:    *Yeah. So,* why the Nigerians? All of them are polytheists.
MA:     They are all polytheists. *We, we, take revenge for our brothers in Nigeria.*
UCE:    There is an Islamic State or there was an Islamic State in Nigeria.
MA:     Of course there is [UI]
UCE:    Boko Haram?
MA:     *Boko Haram. It doesn't – it did not pledge fealty brother.*
UCE:    Of course it did.
MA:     *Not always.*
UCE:    OK.
MA:     *I am not sure about this. And uh, I will Inshallah – they all uh.* They all were pious. But thank God [UI] Abu Walid Al Filastini is the leader|of ISIS *and God willing he will start doing things to the French*

---

[9] GOVT_19219_00472.
[10] GOVT_19219_00480.
[11] GOVT_19219_00481.
[12] GOVT_19219_00482.

A reproduction of the full exchange shows the context in which Mustafa speaks about the Legacy International Worship Center. Mustafa's reasoning for why that target is selected is in direct response to the UCE questioning him. Mustafa's *first response* is that "they are all polytheists." Only after stammering, does Mustafa secondarily present the "revenge of the brothers in Nigeria" rationale. But only a few lines later Mustafa admits he is unsure of what is happening in Nigeria and how it relates to ISIS. But even if he is unsure, it does not matter because he perceives Boko Harm as being suitably "pious." This full context of the conversation shows Mustafa's 1) uncertainty as to exactly why he chose the target; 2) his overall ignorance of geopolitics and whether one group is affiliated with another; 3) how he views whether a group is praiseworthy and deserving of his support depends on how religiously "pious" it is.

During the fourth meeting on June 11, more detailed plans were made about the plot. Mustafa discussed fasting during Ramadan and other religious grievances about Shi'a Muslims, as well as other countries where Muslims are persecuted. Mustafa, the UCE, and the CHS drive to the site of the church and discuss the plan in greater detail, including how to avoid detection from law enforcement. Significantly, during this meeting, Mustafa determined that the goal is to only destroy the church, and elected to only use one explosive device instead of two and also decided that announcing this was done by ISIS is not necessary, instead proposing to "stay quiet."[13]

---

[13] GOVT_19219_00538.

At the last meeting, on June 19, he and the UCE discussed a cleric in Chicago that may be sympathetic to ISIS. Mustafa confirmed, again, that he only wanted to use one explosive device. He is arrested shortly thereafter.

### c.   **Sentencing Guidelines**

The Probation Office calculates Mustafa's total offense score at 37 points, and places him in Criminal History Category of VI, which results in an advisory Guideline range of 360 months to life. Since the statutory penalty authorized by Congress is 0 to 20 years, however, the advisory Guideline range applicable in this case is 240 months. U.S.S.G. § 5G1.1(a). The Probation Office's calculation, however, is significantly inflated because of its application of the "Terrorism" enhancement pursuant to Section 3A1.4, which adds 12 points to Mustafa's offense score and moves him from Criminal History Category I to VI, despite him having no prior criminal history. For reasons argued in Mustafa's position with respect to sentencing factors, and his forthcoming reply to the government's response, that enhancement does not apply in this case. ECF No. 127. Defense counsel intends to set forth additional facts and argument at the time of sentencing on that issue.

Absent the Section 3A1.4 enhancement, Mustafa's total offense score should be calculated as follows:

- Base offense level (§ 2M5.3(a)):                                                26
- Provision of support/resources for violent act (§ 2M5.3(b)(1)):   +2
- Hate crime (§ 3A1.1 – victim based on religion):                        +3
- Acceptance of responsibility (§ 3E1.1):                                       -3

44

- Total Offense Score:                                         28

With no criminal history, Mustafa has zero criminal history points and he falls in Criminal History Category I. Accordingly, his advisory Guideline range is 78 to 97 months.

## IV. MR. ALOWEMER SHOULD RECEIVE A DOWNWARD DEPARTURE AND/OR VARIANCE BECAUSE OF HIS MENTAL AND EMOTIONAL CONDITION AT THE TIME OF THE OFFENSE AND HIS DIMINISHED CAPACITY

The Court may depart below the advisory Guideline range if it finds that the defendant's "mental and emotional conditions[,] … individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines." U.S.S.G. § 5H1.3. Courts around the country have also varied below the advisory Guideline range where the defendant suffered from a mental or emotional condition as a result of their PTSD. *See, e.g.*, *United States v. Taylor*, 736 Fed. App'x 216, 222 (11th Cir. 2018) (variance for defendant's PTSD was not an abuse of discretion). Courts have granted significant variances even when the offense of conviction is violent in nature. *See, e.g.*, *Hicks v. United States*, 2017 WL 412644, at *5 (D.N.H. 2017) (noting "the court expressly found that Hick's PTSD warranted a downward variance" in a bank robbery case); *United States v. Oliver*, 2022 WL 2188967, at *4 (M.D. Ala. 2022) (granting downward variance to jail guard who beat handcuffed prisoners because the defendant's PTSD made him "no less deserving of leniency"). Inherent in these decisions is that, at the time of the offense, the defendant suffered from a mental health and emotional condition to the extent that it impaired their

45

reasoning and therefore mitigated their culpability for their conduct. It also attributes a defendant's conduct to a mental health condition that can be treated, thus reducing the likelihood of recidivism and danger to the community. That same basis for a downward departure and/or variance applies in spades to this case.

As a result of his experience in the Syrian civil war, and the subsequent four years of as a refugee in Jordan, Mustafa suffered from PTSD. As Dr. Guarnera explains in her report, the combination of prolonged (i.e., chronic) threat and deprivation can lead to the "greatest degree of neural changes and associated deficits," especially when those occur during an individual's youth. Guarnera Report at 31. After evaluating Mustafa and reviewing relevant records, she concludes that he "experienced an extreme, chronic history of war and forced resettlement during adolescence that is remarkable for being extremely high on both dimensions: threat *and* deprivation." *Id.* Even after he arrived in the United States, the exposure to crime in Northview Heights, his alienation from fellow students at Brashear, and the constant stream of news of Syria on his phone worked to retrigger the trauma he experienced only a couple of years prior. As a result of that prolonged exposure to threat and deprivation, Dr. Guarnera concludes that Mustafa suffers from PTSD, complex PTSD, and major depressive disorder. Ultimately, Dr. Guarnera concludes:

> In summary, the research on neurobiological development demonstrates predictable changes in brain structure and functioning as a result of early threat and deprivation. Given Mr. Alowemer's extensive threat and deprivation experiences during the Syrian Civil War, these cognitive and behavioral changes are crucial to understanding the offense conduct. Trauma-related cognitive impairments—including executive dysfunction, emotional dysregulation, hyperarousal to threat, and increased suggestibility

and compliance (particularly to authority figures or in social situations)—all appear to have made him more vulnerable to engaging in the offense conduct.

*Id.* at 45.

Through contemporaneous records and interviews with Mustafa, his family, and close friends, his struggles with PTSD and depression are well documented. His family observed signs of depression and withdrawal in Jordan. Upon entry into the United States – after finally escaping the hellish experience of being a refugee child laborer in Jordan for four years – he reported to the evaluator that he was "[f]eeling down, depressed or hopeless (several days)." Teachers at Brashear remarked how he was often tied to his cell phone consuming news and communications from Syria that often led to bouts of depression and mood changes. His sister reports that over time he would more frequently lock himself in his room, distancing himself from his close-knit family, obsessively searching the internet for news about the conflict in Syria. And finally, on February 12, 2019, Brashear employees documented an event shortly after Mustafa learned of the death of close relatives and family friends, after which he expressed suicidal thoughts and was sent home to be with his family. Less than one month after that incident – on March 8, 2019 – an undercover FBI agent made first contact with Mustafa by requesting to be his friend on Facebook. Mustafa's worsening mental health and emotional condition was peaking at the time a preconceived outlet for his discontent was presented to him. Through these records and accounts, it is clear that his PTSD and depression – relating from his experience in the Syrian civil war and subsequent status as a refugee in Jordan – substantially contributed to his conduct in this case.

Dr. Guarnera exhaustively details how his mental health diagnoses contributed to his behavior. First, after detailing how trauma and depression affect a young person's executive function and emotional regulation, she observes that "it is not surprising that Mr. Alowemer began making risky, ill-advised decisions to converse and meet with individuals allegedly involved in terrorist activities only *after* [the February 12, 2019] acute emotional crisis." Guarnera Report at 36. Dr. Guarnera acknowledges that even if he previously held "inclinations sympathetic to their viewpoint," his inability to properly "weigh[] competing values, plan[], control[] emotions, and consider[] future consequences" was likely a contributing factor to his offense conduct.

Second, Mustafa's chronic exposure to threatening experiences during his teenage years led to his hyperarousal to threats inherent in working with individuals holding themselves out to be members of an international terrorist organization, and to the police force to whom he could turn if he wanted to turn himself in. While his conduct – at times – demonstrates an individual willingly participating in the plot, his reported fear of the undercover agents and the police are both intuitive and sufficiently supported by research. As Dr. Guarnera concludes, "[t]his kind of chronic emotional arousal would have further degraded Mr. Alowemer's ability to engage in complex cognitive tasks necessary to come up with a plan to extricate himself from what he perceived to be a dangerous situation." *Id.* at 39.

Third, Mustafa's trauma experiences are associated with both suggestibility (to take on another person's views as your own) and compliance (to acquiesce to requests or demands).[14] Dr. Guarnera acknowledges that Mustafa did, at times, take initiative in his dealings with the undercover agents, but she also cites to numerous instances when the agents asserted themselves in ways that clearly directed Mustafa toward increasingly serious conduct. *Id.* at 40-43. For example, the electronic communications and transcripts produced by the government demonstrate that undercover agents pushed Mustafa beyond his initial intention to merely "work with them in the fields of information dissemination and electronics," and instead go beyond the "keyboard courage" to something more substantial like "cooking" (i.e., making explosives). *Id.* at 40-41. In another instance, the FBI agents repeatedly inquired whether they should raise the stakes of the plot to also harming people rather than merely destroying the church building in the middle of the night when no one would be inside (as Mustafa initially suggested). After those suggestions, Mustafa acquiesced and suggested a second explosive device during the daytime.[15] *Id.* at 42-43. These examples, Dr. Guarnera concludes, indicate that Mustafa "went beyond his own inclinations because he was responding to cues from the FBI employees." *Id.* at 40.

---

[14] As an example, Dr. Gaunera cites research demonstrating that youth with greater trauma exposure are more likely to falsely confess in real-world interrogations. *Id.* at 39 & n. 71.

[15] Mustafa ends up deciding against a second device during the day in that same meeting. *Id.* at 43 & n. 92 ("We want to destroy and burn, I think that just one bag is enough. … I think just one for now.").

Fourth, Mustafa's youth and history of trauma made him more likely to respond with deference to someone perceived to be an authoritative figure. *Id.* at 43 ("As trauma-exposed individuals are already prone to compliance, adolescents with trauma exposure are particularly vulnerable to compliance with those they consider to be an authority."). Throughout his communications with undercover agents, Mustafa refers to himself as their younger brother willing to do as they direct him. For example, the FBI summarized texts Mustafa sent in mid-May 2019 to the UCE, who was in his 30s, was married, and even brought a woman purporting to be his wife to the first meeting: "MA says that he is going to follow UCE's advice, because UCE is older than MA and MA considers UCE as his older brother."[16] In another instance, in his first meeting with the UCE after the UCE established he was the explosives expert, when discussing electronic security measures, Mustafa says: "I will do anything you tell me currently because truthfully I don't know anything."[17] In perhaps the most stark example, during the third in-person meeting, Mustafa tells the UCE: "If you were not here, we wouldn't be do[ing] anything. … Because I don't know nothing, like literally nothing about this …."[18] These professions of deference were not exclusive to the UCE. Mustafa also made similar statements to the OCE (the individual that introduced Mustafa to the UCE) on April 28, 2019: "And you too my brother, if you need anything, don't hesitate Allah willing, I'm your

---

[16] GOVT_19219_000669.
[17] GOVT_19219_000430.
[18] GOVT_19219_000515.

little brother with Allah's permission."[19] Dr. Guarnera concludes that given his trauma history and age at the time of the offense, Mustafa was "neurodevelopmentally primed to comply with individuals he viewed as authority figures, aside from any potential fear motivation." Guarnera Report at 44.

And finally, Mustafa's age and his increased suggestibility and compliance due to his trauma made him more likely to engage in risky behavior when given a peer group in which to act out. Dr. Guarnera observes that "it is not surprising that Mr. Alowemer apparently engaged in no illegal activity when he was alone, and only began to show some mobilization when he was part of a group of three men (along with the UCE and CHS)." *Id.* In that context, Dr. Guarnera notes that "[t]rauma-related deficits in executive functioning would make it even more difficult to inhibit these typical adolescent impulses." *Id.* at 45.

Ultimately, Dr. Guarnera concludes that Mustafa is a "quite low" risk for reoffending. Specifically, she finds he is "highly unlikely to use the internet to seek out ISIS-sympathetic individuals to which he has no connection in real life, in order to plan a terrorist attack on U.S. soil." *Id.* at 55. She concludes that because of his reduced mobilization potential, exposure to trauma treatment, and his inevitable aging out of his previously high-risk group, he presents a low risk for reoffending.

Dr. Guarnera's extremely thorough evaluation of Mustafa and her subsequent report credibly concludes Mr. Alowemer's mental and emotional condition at the time of the offense contributed significantly to his offense conduct.

---

[19] GOVT_19219_000390.

That mitigates his culpability for his offense. Furthermore, with proper supervision conditions and treatment, he is a low risk to reoffend. That reduces the concern for recidivism or danger to the community. Accordingly, a significant variance below the advisory Guideline range is warranted.

### V.   MUSTAFA SHOULD RECEIVE A DOWNWARD VARIANCE BECAUSE HE IS FACING DEPORTATION FOLLOWING HIS SENTENCE

Mustafa will be deported. Having been convicted of an offense that constitutes "terrorist activity," *see* 8 U.S.C. §§ 1182(a)(3)(B)(iii)(V) and (VI), he is subject to deportation. 8 U.S.C. § 1227(a)(4)(B).  As a result of that deportation, he will be separated from his family, he will not be permitted to return to the United States, he will marked with the stigma of having been deported from the United States, and he will be deprived of valuable services and opportunities in whichever country he is sent to. Needless to say, his deportation is a collateral consequence of his conviction and sentence and will represent additional punishment above and beyond that which is contemplated by the Guidelines. Accordingly, a substantial variance is warranted.

For Mustafa, deportation is an immensely difficult result, emotionally and practically. While serving an incarceration sentence in the Bureau of Prisons represents a hardship contemplated by the Guidelines, if Mustafa is deported, he faces the prospect of an even worse future. He has not lived in Syria or Jordan since he was a teenager and his family fled the violence of the civil war. While the future status of that conflict is unknown, it is likely that Mustafa will face immense

danger as a former United States refugee (with family in the United States) who stands convicted of assisting ISIS.

This Court should take this into account when formulating a just sentence. The Third Circuit has recognized that a defendant's deportability status may be taken into account under Section 3553(a) and warrant a downward variance. *United States v. Jimenez*, 328 Fed. Appx. 802, 804 (3d Cir. 2009). Other circuits have found similarly. In *United States v. Thavaraja*, 740 F.3d 253, 262-63 (2d Cir. 2014), the defendant was convicted of conspiracy to provide material support to a foreign terrorist organization and conspiracy to bribe public officials. He faced a guidelines sentence of 240 months, but the district court imposed a below-Guidelines sentence of 108 months in part because the defendant faced likely deportation upon the completion of his sentence. *Id.* at 256. Rejecting the government's argument that immigration consequences of a conviction should not be considered by a sentencing judge, the court explained that "[i]n determining what sentence is 'sufficient, but not greater than necessary,' to serve the needs of justice, a district court may take into account the uncertainties presented by the prospect of removal proceedings and the impact deportation will have on the defendant and his family." *Id.* at 262-63. Other courts have also found that a defendant's deportability warrants a downward variance because the need to protect the public from future crimes is diminished under Section 3553(a)(2)(C). *United States v. Morales-Uribe*, 470 F.3d 1282, 1287 (8th Cir. 2006); *United States v. Ramirez-Ramirez*, 365 F. Supp. 2d 728, 732-33 (E.D. Va. April 18, 2005).

Mustafa's alienage affects him adversely in other ways, as it relates to how he serves his incarceration time. First, the pendency of the ICE detainer and the looming specter of removal proceedings may result in significant time in immigration custody subsequent to the prison term this Court may impose. In other words, upon the conclusion of any sentence this Court imposes, Mustafa will immediately be sent to an ICE facility to be held until the conclusion of his removal proceedings. Therefore, Mustafa will not "get out" at the conclusion of this Court's sentence, he will continue to be held, just by a different agency.

Second, his lack of status deprives him of the opportunity for early release to a residential re-entry center (which results in more time actually served in jail or prison). Third, as a noncitizen, he is likely ineligible for much of the programming that BOP offers, including for rehabilitative purposes, one of the key goals of criminal sentencing. *See* Jacob Schuman, *Federal Prisons Don't Even Try to Rehabilitate the Undocumented*, The Marshall Project (Oct. 17, 2017) (summarizing programs from which aliens are excluded and noting that "[d]espite BOP's rehabilitative promises, the agency excludes [undocumented] prisoners from its best . . . vocational programs.").[20] And lastly, Mustafa security designation score may increase due to his ICE detainer, likely resulting in him being designated to a higher-security facility with greater restrictions on movement throughout his sentence. *See generally* BOP Program Statement 5100.08 (2006) at ch. 4 pg. 11-12,

---

[20] Available at https://www.themarshallproject.org/2017/10/17/federal-prisons-don-t-even-try-to-rehabilitate-the-undocumented (last visited October 8, 2022).

*available at* https://www.bop.gov/policy/progstat/5100_008.pdf (indicating that an ICE detainer can increase a prisoner's security level on a case-by-case basis).

In sum, the Court should grant a substantial variance below the advisory Guideline range based on Mustafa eventual removal proceedings, the future danger that deportation would present, and the effect of his alien status on his time while incarcerated.

## VI.    MR. ALOWEMER SHOULD RECEIVE A DOWNWARD VARIANCE BECAUSE OF THE SYSTEMIC MANIPULATION AND RADICALIZATION OF YOUNG PEOPLE PERPETRATED IN THE MIDDLE EAST AND ON SOCIAL MEDIA

Environmental factors in a defendant's life that socialized them toward criminal behavior are often considered by courts in assessing an appropriate sentence. *See, e.g.*, *United States v. Bannister*, 786 F. Supp. 2d 617 (E.D.N.Y. 2011). For that reason, it is common for courts to cite to a defendant's upbringing, exposure to drugs and violence as a child, or the effects of poverty and hunger that affected their development. While such factors do not excuse a defendant from the crimes they commit, the exposure to such environmental elements explains how they came to make the decision to engage in a criminal lifestyle. That analysis mitigates their culpability because their perceived range of choices – law abiding versus non-law abiding decisions – were more limited than the average person. The environmental factors present in Mustafa's life leading up to his offense mitigates his culpability in this case.

Dr. Weine's report details the advanced and effective means by which groups like ISIS lure, influence, and recruit individuals around the world through social

media.[21] He details how ISIS intentionally targets individuals most susceptible to radicalization; namely "males under 25, in non-Muslim Western countries, who feel isolated, rejected and/or humiliated due to the adversity they have experienced in their lives." Weine Report at 3. Those individuals commonly turn to online forums and social media "in search of answers and become part of a virtual community or ecological niche." *Id.* That online environment is "designed [by ISIS] to engage them, normalize them to extremism and violence, and motivate them to support and conduct violent acts which promote the ISIS cause." *Id.* at 4. ISIS uses social media sites such as Facebook, Instagram, Skype, and YouTube to "develop an interpersonal dialogue" with people like Mustafa and to "substantiate" its beliefs and goals. Indeed, FBI Director Comey, in his July 2015 testimony before the United States Senate stated that "[s]ocial media has allowed groups, such as ISIL, to use the Internet to spot and assess potential recruits [and they therefore] now ha[ve] direct access into the United States like never before." *Id.*

Much in the same way that a child who observes drug use and gun violence every day while growing up in an impoverished neighborhood, disaffected young people searching for meaning online and exposed to ISIS's perverted content will become socialized to accept such extreme behavior. Dr. Weine reviewed Mustafa's online conduct *before* FBI agents contacted him and concluded his posts and "likes"

---

[21] The practice of using online content to radicalize individuals is not limited to extremist Muslim groups like ISIS. As Dr. Weine notes, "[t]hese same approaches are used not only by ISIS but also by white supremacist recruiters" here in the United States. *Id.* at 7.

were consistent with this phenomenon. As Dr. Weine notes, Mustafa was "young, traumatized, depressed, and suicidal" while harboring guilt for having left Syria. *Id.* at 6. Mustafa "wanted to do something significant to help Syrians and other Muslims." In light of his age and trauma history, Mustafa "approached, rather than retreated, from potential threats or dangers presented by ISIS …." *Id.* Ultimately, Dr. Weine finds that ISIS content and recruitment online – especially for someone desperately searching for news content on the Syrian conflict – "at least explains his actions in the context of a larger phenomenon that has been extraordinarily effective at preying on adolescents like Mr. Alowemer who have experienced extreme trauma." *Id.* at 7.

In light of Mustafa' background and the online environment he was drawn to in search for news about Syria and meaning about his role in that conflict, he was socialized to accept the extreme fundamentalist views espoused by ISIS. Although that does not excuse his offense, in any way, it does shed light on how this happened and it mitigates his culpability in this case. For that reason, a further downward variance is warranted.

## VII.   MR. ALOWEMER SHOULD RECEIVE A DOWNWARD VARIANCE BECAUSE OF THE UNUSUALLY HARSH CONDITIONS OF HIS PRETRIAL CONFINEMENT

As stated above, Mustafa has been in custody for nearly 41 months. The majority of his custody was during the COVID-19 pandemic. Although we know that all local jails severely restricted movement and access to programing for prisoners during the pandemic in order to stem the spread of the virus within their walls,

there are extensive public records showing that was the case at ACJ, where Mustafa spent a majority of his time in custody.

First, inmates were unable to receive visitors. Allegheny County Jail, *COVID-19 Information, Our Response, available at* https://www.alleghenycounty.us/ jail/index.aspx. In fact, in-person visitation for inmates was suspended for multiple years after a consent decree was entered into between ACJ and litigants in a class action lawsuit filed in this District. Consent Order, *Graham, et al. v Allegheny County, et al.*, Case No. 20-cv-496 (Dkt. No. 71) (May 27, 2020). In particular, the Consent Order attaches an agreed upon Continuing of Operations Plan ("COP") which details how ACJ will handle operations during the COVID-19 pandemic.

Second, inmate programming was indefinitely suspended or drastically curtailed. According to the COP, ACJ suspended all "non-essential services in the facility" in order to "restrict the number of individuals entering/exiting the facility. COP at 13. This means no men's group, no group therapy sessions, no congregating to discuss and relate difficult traumas and barriers to opportunity with others with similar life backgrounds. While it is understandable that such services be altered in the midst of a deadly pandemic, the lack of such support groups undoubtedly affects the nature of the inmate's time in custody in a negative manner. While those restrictions gradually eased over time, Mustafa acutely experience the lack of programming due to his mental health conditions. *See* discussion, *supra*, Section III.a.vii.

Third, inmate recreational time was severely limited. In order to comply with health officials' recommendation to reduce groups of greater than 10 individuals from congregating, ACJ determined that "a reduced number of inmates will be permitted out of their cell (not to exceed 10)." *Id.* at 17-18.  The practical effect of this regulation is that inmates were relegated to a maximum of one hour a day out of their cell – commonly referred to as 23 and 1 – for long periods of time. Anecdotally, undersigned counsel can report this protocol has not only reduced the time an ACJ inmate can exercise, interact socially with other inmates, or just get out of their cell, but it also has reduced the amount of time they can make phone calls to family and friends. Furthermore, there have been numerous incidents where the jail decided an inmate quarantine is necessary in order to prevent an outbreak.

Fourth, mental health therapeutic programming remained limited for long periods of time. Transcript, Jail Oversight Board at 4 (July 2, 2020), *available at* https://alleghenycontroller.com/boards-meeting-minutes/.

Put together, Mustafa's presentence custody in this case has been far more harsh than what is typical for a defendant in this District. He has been kept from seeing his family, he has had little to no access to inmate programming, his recreational time has been drastically curtailed, his access to phones likewise has been limited, and the jail has struggled to provide regular mental health treatment to its inmates since the pandemic began. Custody is a restriction of liberty in order to achieve the four pillars of our criminal justice system (retribution, deterrence,

incapacitation, and rehabilitation). But when that term of custody is more onerous and restrictive than what is typically experienced by the average prisoner, that punishment is incrementally harder to bear. *See United States v. Sutton*, 973 F Supp. 488, 493 (D.N.J. 1997), *aff'd* 156 F.3d 1226 (3d Cir. 1998) ("Unusual pretrial confinement … in either length or severity of condition, can properly be considered by the sentencing court."). Accordingly, the Court should recognize the harsh conditions in which Mustafa has been confined during the 3.5 years and grant a variance from the advisory Guideline range.

**VIII.   MUSTAFA SHOULD BE SENTENCED TO A TERM OF INCARCERATION WITHIN THE NON-3A1.4 GUIDELINE RANGE BECAUSE SUCH A PUNISHMENT WOULD BE COMPARABLE TO SENTENCES RECEIVED BY OTHER INDIVIDUALS ENGAGED IN SIMILAR CONDUCT**

Section 3553(a)(6) directs district court judges to be mindful of "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." There is no precedent in this District in terms of comparable cases for determining the relative seriousness of the conduct in Mustafa's case. There are, however, comparison cases from other districts that are instructive and share some aspects with this case.

In *United States v. Wright et al*, 1:12-cr-0238 (N.D. Ohio) the defendants conspired to attack financial institutions, bridges, and police in the Cleveland area, hoping to explicitly link the attacks to frustration over economic inequality in the United States. *See United States v. Stafford*, 782 F.3d 786 (6th Cir. 2015) (upholding *Wright* on appeal). They were charged with § 2332 (attempted use of a

weapon of mass destruction, which carries a 25-year maximum penalty). The defendants purchased what they believed to be explosives from an informant and placed those fake explosives at the base of a bridge outside of Cleveland. The defendants attempted to blow up the bridge with a cell phone detonator. One defendant was convicted after trial and the remaining four defendants pled guilty. The defendant who pled guilty received 10 years, while the remaining defendants received 11.5 years, 9.75 years, 8 years, and 6.75 years with an average sentence of 9.25 years.

In *United States v. Khan*, 1:14-cr-564 (N.D. Ill. 2016), a former national guardsman gave money to ISIS officials while he was traveling in Africa. He also purchased a handgun, traveled overseas with the intent of making contact with an ISIS member, and purchased an assault rifle as part of a plot to kill United States servicemembers. His internet search history included terms such as "Orlando Shooting Weapon" and ".23 not lethal enough for civilians." The defendant pled guilty to § 2339b and was sentenced to 132 months.

In *United States v. Farrokh*, 1:16-cr-20 (E.D. Va. 2016), Farrokh was arrested in the Richmond Airport before he could board a plane to travel to Syria to join ISIS. Similar to Mustafa, Farrokh swore an oath of allegiance and stated he wanted to kill and be killed for Allah. Significantly, Farrokh went further by agreeing to travel the country and kill Americans. At sentencing, the district court granted a significant downward departure under § 4A1.3(b) because the Guidelines significantly overstated the defendant's criminal history, and a significant

61

downward variance under § 3553(a). His guideline range was 292-365 months but ultimately he received a sentence of 102 months.

In *United States v. Thavaraja*, 740 F.3d 253 (2d Cir. 2014), the defendant, a Sri Lankan native, was the principal procurement officer for the Tamil Tigers foreign terrorist organization. He was detained in Indonesia in 2007 and extradited. He pled guilty to § 2339b and his guideline sentence was 240 months. Despite this, the district court sentenced him to 108 months incarceration. At the time of his arrest Tharvaraja was 33 years old and been engaged in a prolonged pattern of terrorist activity as the chief procurement officer. His "function [in securing arms for the Tamil Tigers] was critical and involved . . . the procurement of deadly merchandise almost inevitably used to injure, murder, main, not only military but also civilians." 740 F.3d at 258. As such, he was far more morally and criminally culpable than Mustafa in this case. Despite this, the court found a substantial downward variance was appropriate because he had no prior criminal record and he taught and worked with other inmates in pretrial detention. *Id*. at 260. Mustafa has similarly used his time in pretrial detention for the betterment of himself and others.

In *United States v. Conley*, 14-cr-163 (D. Co. 2014), the defendant pled guilty to one count of conspiracy where the predicate statute was § 2339b material support to Al-Qaeda and ISIS. According to the plea agreement, Ms. Conley met an active ISIS member and soon after joined the United States Army Explorers to receive military training in tactics and firearms for the purpose of helping ISIS. She

traveled from Colorado to Texas to attend the training. One year later, she was apprehended before she could get on a plane to Turkey where she planned to make her way to Syria to fight with ISIS. When she was arrested, Conley was in possession of numerous items demonstrating proficiency and certifications of a number of specialized skills, including first aid/nursing certification, U.S.A.E., and NRA gun certifications. She also had numerous books from ISIS leaders. She received 60 months imprisonment.

In *United States v. Wolfe*, 14-cr-213 (W.D. Tex. 2014), Wolfe pled guilty to one count of § 2339b arising from his extensive efforts to go to Syria and join ISIS, including obtaining special certifications for he, his wife, and child to travel, raising money to finance travel to Syria, and creating a ruse to disguise the actual nature of his trip. *United States v. Wolfe*, 1:14-cr-213, Criminal Complaint, at 2-11. During the planning of the trip, the 24-year-old Mr. Wolfe showed he intended to bring his wife and two young children with him to join ISIS. He pled guilty and received a sentence of 82 months.

In *United States v. Warsame*, 651 F. Supp. 2d 978 (D. Minn. 2009), the defendant pled guilty to one count of conspiracy to provide material support to ISIS based on conduct that he traveled to Afghanistan and trained with Al-Qaeda, met and attended lectures by Osama Bin Laden, and continued to keep in contact with Al-Qaeda members. Because he had no other criminal history, the court granted a significant downward variance. He received 92 months of imprisonment.

63

While the above cases share some similarities with Mr. Alowemer's case, these are not the only cases in which a conviction for § 2339b resulted in a sentence comparable to the request in this case. *See e.g.*, *United States v. Daniels*, No. 2:16-cr-222 (N.D. OH 2016) (80 months); *United States v. Ludke*, 16-cr-175 (E.D. Wis 2106) (66 months); *United States v. Brown*, 14-cr-58 (E.D. NC 2014) (92 months and 102 months).

Accordingly, in light of other similar cases, a sentence within the non-3A1.4 advisory Guideline range is appropriate in this case.

## IX.   <u>CONCLUSION</u>

In light of the above, a sentence between 78 and 97 months is sufficient but not greater than necessary to achieve the purposes of sentencing.

Respectfully submitted,

**/s/ *Andrew Lipson***
ANDREW LIPSON
Assistant Federal Defender
1001 Liberty Avenue
Pittsburgh, PA. 15222-3714
Main: 412-644-6565
Fax: 412-644-4594
E-mail: andrew_lipson@fd.org

**/s/ *Sam Saylor***
SAM SAYLOR
Assistant Federal Defender
1001 Liberty Avenue
Pittsburgh, PA. 15222-3714
Main: 412-644-6565
Fax: 412-644-4594
E-mail: sam_saylor@fd.org